**MAPCO, INC., Plaintiff,**

v.

**PIONEER CORPORATION and Amarillo Oil Company, Defendants.**

**Civ. A. No. CA–2–75–170.**

United States District Court,
N. D. Texas,
Amarillo Division.

Jan. 13, 1978.

R. D. Lemon, Lemon, Close, Atkinson & Shearer, Perryton, Tex., Royse M. Parr, Mapco Inc., Tulsa, Okl., for plaintiff.

John L. Estes, Locke, Purnell, Boren, Laney & Neely, Maurice E. Purnell, John R. Guittard, Dallas, Tex., for defendants.

## MEMORANDUM OPINION

WOODWARD, Chief Judge.

The above case was heard before the court without a jury and after hearing and

considering the evidence, pleadings, and the argument and briefs of counsel the court files this memorandum opinion which shall constitute the court's findings of fact and conclusions of law.

The court finds that there is complete diversity of the parties and the amount in controversy exceeds $10,000.00 exclusive of interest and costs and jurisdiction exists under 28 U.S.C. § 1332.

This litigation involves a controversy over the right to produce and market liquid hydrocarbons derived from natural gas originating from the West Panhandle Gas field located in the northern panhandle region of the State of Texas.

In 1927 defendant, Amarillo Oil Company, (AOC) owned a large area of gas leaseholds, gas wells and other gas property located in various counties in the West Panhandle Field. On June 5, 1928 a transaction was consummated whereby AOC would sell its West Panhandle Field interests and in return have the right to purchase natural gas from that field.

Pursuant to the June 5, 1928 transaction AOC conveyed all its gas interests in the West Panhandle Field to Canadian River Gas Company (Canadian). AOC and Canadian also entered into a contract whereby Canadian would sell to AOC natural gas from the West Panhandle Field. This contract will hereinafter be referred to as the "B" contract and it is from this instrument that the basic facts leading to this litigation arise.

In relevant part the "B" contract provided that the seller, Canadian, would sell and deliver to buyer, AOC, and buyer would purchase and take from seller (a) all natural gas in excess of that purchased by AOC from other producers required by AOC for sale under and pursuant to a contract between AOC and Panhandle Pipe Line Company (Panhandle) to supply the customers of Panhandle in the City of Amarillo and its environs; and (b) all the natural gas in excess of that purchased by AOC from other producers required by AOC for sale under and pursuant to a contract between AOC and United States Zinc Company to supply that company's zinc smelter located at Amarillo, Texas; and (c) all the natural gas in excess of that purchased by AOC from other producers required by AOC to supply any customers located in the City of Amarillo or its environs which AOC, Panhandle or Amarillo Gas Company had then or might thereafter acquire.

The "B" contract further provided that AOC's right to buy natural gas would have first preference and call over any other gas sales by Canadian from the West Panhandle Field "in the nature of covenants running with the lands."

Prior to the execution of the "B" contract in 1928, AOC contracted in 1918 to sell to Perry A. Little the gas at any and all wells owned by AOC in Potter and adjoining counties (in the West Panhandle Field) "sufficient to supply all needs of Amarillo and vicinity" but expressly reserved to itself "the right to the gasoline which may be derived from such natural gas." Little subsequently assigned his rights under this contract to Panhandle. This same contract as amended in 1922 was attached to the "B" contract and was referred to therein where the "B" contract granted AOC the right to purchase all natural gas required by it under and pursuant to its contract with Panhandle.

Additionally, on July 31, 1922, AOC prior to conveying its gas interests in the West Panhandle Field to Canadian, sold to J. J. Hastings the privilege of extracting natural gasoline from natural gas delivered pursuant to its contract with Little (later Panhandle) and from any other natural gas sold for use in Amarillo. AOC was to receive on a sliding scale, 25% to 45% of all natural gasoline so extracted. J. J. Hastings later conveyed his rights under this 1922 contract to Cannon Gasoline Co.

Thus, subsequent to the execution of the 1928 "B" contract Canadian owned the various gas related interests in the West Panhandle Field previously owned by AOC, subject to AOC's right to purchase natural gas under the "B" contract provisions discussed above, and Hastings (later Cannon)

had the right to extract natural gasoline from gas being supplied pursuant to the "B" contract until this right was reconveyed by Cannon to AOC in 1951.

In 1951 AOC's parent, Southwestern Development Co., entered into an agreement with Canadian and Colorado Interstate Gas Co. (CIG) whereby Canadian would be merged with CIG. As a part of this agreement Canadian deeded to Westpan Hydrocarbon Company on December 26, 1951 "all hydrocarbons having a boiling point as high and higher than ethane, including without limitation, all ethane, propanes, lentanes, pentanes and all heavier hydrocarbons contained in the natural gas in place" in and under the West Panhandle Field lands and leaseholds then owned by Canadian, "less, however, only such hydrocarbon constituents required in good faith" to be delivered to AOC by Canadian under and pursuant to the "B" contract.

On September 10, 1963, Mapco Inc., plaintiff herein, acquired all rights conveyed by Canadian to Westpan under the December 26, 1951 deed (Westpan Deed) referred to above, that is, all the hydrocarbons contained in the natural gas in place under the leaseholds owned by Canadian prior to Canadian's merger with CIG in 1951.

As noted, on November 26, 1951, AOC repurchased Cannon's right to extract natural gasoline from natural gas sold for use in Amarillo and vicinity and also purchased the Cannon gasoline plant in use at that time. AOC operated the old Cannon plant until its new extraction plant was completed at Fain, in 1952, and since that time AOC or its assignee has extracted liquid hydrocarbons from gas delivered pursuant to the "B" contract. It is the extraction and marketing of these liquid hydrocarbons by AOC that forms the basis of this action.

The plaintiff seeks a declaratory judgment that it owns all liquid hydrocarbons in place under the relevant leaseholds in the West Panhandle Fields, and that all liquid hydrocarbons extracted by defendant at its Fain plant must be sold for consumption by customers in the City of Amarillo, Texas or its environs. Additionally plaintiff claims

that it is entitled to reimbursement for certain butanes and propanes which have been extracted from gas purchased by defendants under the "B" contract and marketed outside the City of Amarillo and its environs.

■ The plaintiff also claimed at the time of trial, although not included in the pleadings or pretrial order of this case, that it was entitled to 45% of the net proceeds received by defendants from the sale of natural gasoline extracted from gas delivered under the "B" contract. Defendants duly objected to the inclusion of evidence on this issue at trial, and the court is of the opinion that the failure of plaintiff to include a claim for this item in any of the pleadings or pretrial order submitted to the court mandates a denial of this claim. *Marble v. Batten & Co.*, 36 F.R.D. 693 (D.C.Dist. Ct.1964). However, even had the plaintiff properly pleaded and asserted its claim to 45% of the net proceeds from the sale of natural gasoline extracted from the gas in question, a recovery on this claim would be denied to plaintiff on the basis of the facts as found and the conclusions reached by the court in this respect.

Mapco's claim to 45% of the natural gasoline extracted from natural gas supplied pursuant to the "B" contract is necessarily based upon the 1928 conveyance from AOC to Canadian whereby AOC "granted, sold, conveyed, transferred and assigned . . . unto [Canadian] all gas, gas rights and gas privileges of every kind and character whatsoever . . . ." owned by AOC in the West Panhandle Field. Mapco's theory is that this conveyance included AOC's right to 45% of natural gasoline extracted from natural gas supplied to the City of Amarillo, such right existing in AOC by virtue of its 1922 contract with Hastings. Then, under Mapco's reasoning, this right passed to its predecessors and thus to it under the Westpan deed wherein Mapco's predecessors acquired from Canadian the liquid hydrocarbons in place in the West Panhandle Field.

Assuming, but not so finding, that the 1928 AOC to Canadian conveyance was suf-

ficient to convey the right to 45% of extracted natural gasoline to Canadian, this court finds that such right was reconveyed to AOC under the "B" contract and thus Mapco is entitled to no recovery pursuant to this claim.

The "B" contract purports to convey to AOC from Canadian "all natural gas" required by AOC to supply its customers in Amarillo and its environs as well as the gas required by AOC to fulfill its contracts with Panhandle and the zinc smelter. Under Texas law a conveyance of "all natural gas" conveys to the grantee natural gasoline contained within that gas. *Lone Star Gas Co. v. Stine,* 41 S.W.2d 48 (Tex. Com.App.1931). Therefore, even assuming that the 1928 conveyance by AOC of its gas interests in the West Panhandle Field to Canadian was sufficient to include therein AOC's right to 45% of the natural gasoline extracted from gas supplied to the City of Amarillo, the "B" contract reconveyed such right back to AOC by virtue of the fact that the "B" contract conveyed to AOC title to all natural gasoline contained within the gas supplied for Amarillo and its environs.

Secondly, Mapco claims that it owns and is entitled to recover the value of liquid hydrocarbons previously extracted and which may be extracted in the future from natural gas purchased by AOC under the "B" contract. The hydrocarbons referred to are principally butane and propane (LPGs) which have been extracted from the wellhead gas by AOC and these LPGs then were sold by AOC to Phillips and later to Koch, who in turn transported these LPGs to their customers without the State of Texas.

The plaintiff concedes that AOC has the right to purchase all of the gas from the West Panhandle needed to supply its customers in Amarillo and its environs, but Mapco asserts that this right to purchase does not include the right to extract LPGs and to sell such LPGs outside Amarillo and its environs.

The issue presented in its simplest form is whether or not AOC can extract LPGs from the natural gas it purchases under the "B" contract for sale to its customers in the City of Amarillo and its environs, and then sell these extracted LPGs outside the confines of Amarillo and its environs.

This court finds and concludes that the "B" contract and the 1951 Westpan deed are not ambiguous, and that under these instruments AOC has the right to extract LPGs from gas purchased pursuant to the "B" contract and market such LPGs outside the City of Amarillo and its environs. The specific provision of the "B" contract prevail over the general terms of the 1928 conveyance to Canadian by AOC, even though these instruments are construed as one because of their simultaneous execution. Mapco therefore is not entitled to recover any proceeds from the LPGs so extracted and marketed from the "B" contract gas.

The court finds that the defendants purchased only such natural gas required by the good faith exercise of business discretion by defendants in supplying its Amarillo customers under the "B" contract.

The purchase of such natural gas and the extraction and sale of hydrocarbons from this natural gas have always been done in good faith in accordance with the provisions of such contract and was in accord with the provisions of the December 26, 1951 deed to Westpan Hydrocarbon Co.

The natural gas to be delivered to AOC by Canadian under the "B" contract was defined in Paragraph VII of that instrument as follows: "The natural gas delivered hereunder at the gate valves of Seller's [Canadian's] wells shall be natural gas as produced in its natural state from the wells."

It is settled in the State of Texas that the conveyance of "natural gas" includes all of the constituent hydrocarbons contained therein. The leading case, *Lone Star Gas Co. v. Stine,* 41 S.W.2d 48 (Tex. Com.App.1931), was instituted by a grantor under a gas deed who was seeking an accounting for natural gasoline extracted from natural gas produced by the grantee

under said deed. The grant in the deed in question in *Lone Star* was of "all natural gas" in and under these lands. The court rejected the grantor's claim with the following language:

"The term 'all natural gas' would include all the substances that come from the well as gas, and that regardless of whether such gas be wet or dry. . . The legal effect of the deed was to convey 'all natural gas,' and by the term 'natural gas' is meant all the constituent elements composing the same. The gas company, having become the owner of 'all natural gas' in or under this land, has the right to make use thereof as it sees fit. It may sell the gas in its natural form as it came from the earth, or it may split it into its constituent elements and sell such elements, including the gasoline. . . ." *Lone Star, supra,* at 49.

Plaintiff takes the position that, even though in an ordinary sale of natural gas hydrocarbon constituents of such gas are included in the sale, the conveyances for the natural gas and the agreement to buy and sell in this case contain such limitations as to prevent the passage of title or the right to extract LPGs from the natural gas in question by AOC. Such is not the case. The "B" contract gives AOC the right to purchase "all natural gas" needed to supply all its customers in the City of Amarillo and its environs, as well as Panhandle and the Zinc Smelter. Nowhere does it purport to limit AOC's right to extract LPGs from said gas, or to restrict the manner in which such LPGs may be marketed. Absent such a restriction, it cannot be said that AOC does not have the right to dispose of the LPGs as it sees fit, as the title to such LPGs passed exclusively to AOC by virtue of the conveyance contained in the "B" contract.

The Westpan Deed under which Mapco claims recognizes this. Said deed purports to convey to Westpan Hydrocarbon Company (Mapco's predecessor in interest) all hydrocarbons contained in the natural gas in place in and under the relevant leaseholds and lands in the West Panhandle Field, "less, however, only such hydrocarbon constituents required in good faith (a) to be delivered by Grantor [Canadian] to [AOC] . . . under and pursuant to . . . the "B" contract. . . ."

The specific reference by the parties in the "B" contract to the gas supply contracts with Panhandle and the Zinc Smelter (Ex. E & F to "B" contract) conclusively prove that the parties contemplated the delivery of "dry" gas (from which certain hydrocarbons had been extracted). It was never the intention of anyone entering into these contracts that the right to extract and sell LPGs from the gas supplied under the "B" contract would belong to anyone other than AOC even though the LPGs would be sold outside of Amarillo. As is readily evident from the above quoted portion of the Westpan Deed, the parties to that instrument recognized AOC's ownership of the hydrocarbon constituents contained within the gas delivered pursuant to the "B" contract, and Mapco, who claims under this deed, cannot now be heard to refute such ownership.

Additionally, the plaintiff contends that AOC has breached the "B" contract by selling some of the gas purchased thereunder outside the City of Amarillo and its environs. This contention is based principally upon the fact that some of AOC's customers are located outside the city limits of Amarillo. In this respect, the court finds that insofar as the sale of natural gas is concerned, all such sales have been in the City of Amarillo or its environs as that term is used in the "B" contract.

Should there be any question concerning the interpretation of the documents herein involved, or should there be any question as to whether or not such documents are ambiguous, the court is convinced that the construction placed on this contract by the acts of the parties in performing thereunder compel a like conclusion.

"Intent of the parties generally will be determined solely by the words employed in the written instrument, where the meaning of such instrument is clear and unambiguous" (Texas citations omitted), *Fowler v. Pennsylvania Tire Co.,* 326 F.2d 526 (5th

Cir. 1964). However, where a contract or agreement is unclear or of doubtful meaning, the court may properly consider acts done by the parties in the course of performance when interpreting what the parties were called upon to do by the agreement. This is because a person's construction of his own language is the highest evidence of his intentions. *Fowler, supra,* at 532.

In the instant case the evidence shows that neither Mapco or its predecessors in interest ever challenged AOC's right to extract and sell outside of Amarillo the liquid hydrocarbons from natural gas supplied under the "B" contract until shortly before Mapco filed this action in 1975. AOC or its assignee has extracted natural gasoline from gas supplied under the "B" contract since the execution of the Hastings contract in 1922. This represents a period exceeding 50 years wherein the various parties to the "B" contract and their successors in interest have recognized AOC's right to extract said gasoline. Furthermore, Mapco, through its senior officers, has known since at least 1963 that AOC was extracting liquid hydrocarbons as well as natural gasoline from gas supplied pursuant to the "B" contract at AOC's Fain plant, and that AOC was selling these products to Phillips, and later Koch, for resale outside the State of Texas. Mapco also knew that AOC modernized and increased the Fain plant's capacity 1965 so as to extract increased amounts of liquid hydrocarbons by the then new refrigeration absorption method. Additionally, in 1970 Mapco contracted with Koch to transport these same liquid hydrocarbon products that Koch purchased from AOC through its (Mapco's) lines to Koch's customers outside the State of Texas.

This evidence conclusively shows that Mapco and its officers knew, and have known for well over the past ten years, that the LPGs were being extracted from the natural gas stream purchased by AOC for sale to its Amarillo customers and knew that these same LPGs were not only being extracted but were actually being sold outside the state.

It was not until this suit was filed November 21, 1975, or shortly prior thereto, that a demand was made by Mapco of AOC for an accounting as to the LPGs in question. Mapco's predecessors had never made any such claim. It is obvious and conclusive that Mapco throughout the years since it had purchased these hydrocarbon interests in 1963 knew of and recognized that AOC not only had the right to extract the LPGs from the natural gas stream, but it also knew of and recognized AOC's right to sell these extracted LPGs to customers outside the City of Amarillo and its environs.

It is clear from this evidence that all parties, by their acts in connection with the purchase and sale of gas under the "B" contract, have at all times construed said contract as giving to AOC the right to extract LPGs. This interpretation placed on the contract by their actions is binding on the parties and the court can construe the contract in no other manner. "The practical construction placed upon a contract by the parties themselves constitutes the highest evidence of their intention that whatever was done by them in the performance of the contract was done under its terms as they understood and intended same should be done," (citations omitted), *Lone Star Gas Co. v. X–Ray Gas Co.,* 139 Tex. 546, 164 S.W.2d 504 (1942).

Further, this court concludes that plaintiff's claims are barred by the doctrines of estoppel and ratification.

Concerning estoppel, as noted this court finds that Mapco knew as early as 1963 that AOC was extracting LPGs from gas purchased under the "B" contract and was selling those LPGs to Phillips who in turn sold them outside the state. In January of 1971 AOC ceased selling the liquid hydrocarbons produced at its Fain plant to Phillips and began selling them to Koch. Koch and Mapco in the same year entered into an agreement whereby Mapco was to transport liquids, owned by Koch and produced at the Fain plant, through Mapco's interstate pipeline to destinations outside the state as designated by Koch in return for a tariff to be paid by Koch.

The court finds that Mapco entered into the Koch transaction with the knowledge that the liquids to be transported for Koch were being purchased by Koch from AOC and were being extracted at the Fain plant from gas purchased under the "B" contract. Since January 1971, Mapco has transported in its interstate pipeline liquids produced at the Fain plant and Koch has paid Mapco for the same. Mapco has continued to transport said liquid hydrocarbons and to accept payment therefor, despite allegations that AOC has no right to extract the same.

"There is an implied condition that he who accepts a benefit under an instrument must adopt the whole of it, conforming with all of its provisions, and renouncing every right inconsistent with them." *Simmons v. Clampitt Paper Co.,* 223 S.W.2d 792 (Tex.Civ.App.—Dallas 1949, err. ref'd n. r. e.). In the instant case Mapco cannot accept benefits for transporting liquid hydrocarbons for Koch and at the same time dispute AOC's right to extract same and thereby AOC's right to sell the same to Koch.

■ Similarly, Mapco, by entering into the transportation contract with Koch, knowing that Koch was obtaining the liquid hydrocarbons to be transported from AOC, and knowing said liquid hydrocarbons were being extracted by AOC from gas supplied under the "B" contract, consented, approved and ratified the agreement between Koch and AOC for the sale of said liquids and cannot now dispute AOC's title to said liquids or of AOC's right to extract the same. "Where one having the right to accept or reject a transaction takes and retains benefits thereunder, he ordinarily ratifies the transaction, is bound by it, and cannot avoid its obligation or effect by taking a position inconsistent with it at a later time." *Turcotte v. Trevino,* 499 S.W.2d 705 at 712 (Tex.Civ.App.—Corpus Christi 1973, ref. n. r. e.). Here, Mapco cannot accept and retain benefits under the transportation contract and at the same time claim that AOC has no right to extract liquids at the Fain plant and sell them to Koch for whom Mapco is transporting those liquids.

Such a position is clearly inconsistent with Mapco's position vis-a-vis the transportation contract with Koch.

In conclusion, the court finds that Mapco is not entitled to the declaratory relief for which it asks, nor is it entitled to any proceeds from hydrocarbon constituents extracted by AOC from gas purchased under the "B" contract and sold outside of Amarillo and its environs in the past or which may be so extracted and sold in the future.

The court has attached hereto certain findings of fact and conclusions of law which are being incorporated herein and constitute a part of the court's findings and conclusions in addition to those contained in this memorandum.

A judgment will be entered by the court in accordance with this opinion, denying all relief to plaintiff and assessing costs against the plaintiff.

## ADDITIONAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

### FINDINGS OF FACT

1. On December 7, 1918, Amarillo Oil agreed to sell to Perry A. Little the gas from any wells on leaseholds owned by Amarillo Oil in Potter County and adjoining counties sufficient to supply all needs of Amarillo and vicinity, but Amarillo Oil reserved to itself the right to extract the gasoline from such gas. (Def. Ex. 108, ¶ IV, 1, 12.)

2. On March 13, 1922, Little and Amarillo Oil executed a Supplemental Contract reciting that Little had transferred his right to buy gas for Amarillo and vicinity to Panhandle Pipe Line Company ("Panhandle Pipe Line"), and providing that if Amarillo failed to exercise its reserved right to extract its gasoline from such gas, then Panhandle Pipe Line could remove the gasoline but only to the limited extent necessary to prevent clogging of gas lines and permit the safe and practical transportation of the gas. (Def. Ex. 109, ¶ 5, 5(i).) This limitation on the extraction right of Panhandle Pipe Line is indicative and in recognition of Amarillo Oil's greater extraction right under the 1918 agreement.

3. On July 31, 1922, Amarillo Oil sold to J. J. Hastings the right which Amarillo Oil reserved in the 1918 and 1922 transactions with Little to extract gasoline from gas sold to Panhandle Pipe Line, and the right to extract gasoline from any other gas sold for use in Amarillo and vicinity. (Def. Ex. 104.)

4. At that time the term, "gasoline", referred to the liquid hydrocarbons which could be extracted from raw natural gas with current gas processing technology and market factors, and included gasoline and some butane.

5. Hastings later transferred to Cannon Gasoline Company ("Cannon") his extraction rights under his July 1922 agreement with Amarillo Oil.

6. On April 5, 1927, Amarillo Oil's parent, Southwestern Development Company, joined Cities Service Company and Standard Oil Company (New Jersey) in a Memorandum of Stipulations which provided that Amarillo Oil would convey its West Panhandle Gas Field interests to Canadian River Gas Company ("Canadian") in exchange for the right to purchase gas in its natural state from that field. (Def. Ex. 105.)

7. On June 5, 1928, the transaction was closed in New York City where three important documents were signed at the same time:

1) the 1928 "B" Contract (Def. Ex. 107);

2) the 1928 Cost Contract (Def. Ex. 106);

3) the 1928 Assignment (Pl. Ex. 500p).

8. The 1928 "B" Contract provides in part as follows:

I. Seller [Canadian] agrees to sell and deliver to Buyer [Amarillo Oil] and Buyer agrees to purchase and take from Seller and pay for:

(a) All the natural gas in excess of that purchased by Buyer from other producers required by Buyer for sale under and pursuant to the contract hereto annexed and marked Exhibit "E" to the Panhandle Pipe Line Company to supply the customers of the Panhandle Pipe Line Company in the City of Amarillo and its environs in the State of Texas;

(b) All the natural gas in excess of that purchased by Buyer from other producers required by Buyer for sale under and pursuant to the contract hereto annexed and marked Exhibit "F" to the United States Zinc Company to supply the United States Zinc Company's smelter located at Amarillo, Texas;

(c) All the natural gas in excess of that purchased by Buyer from other producers required by Buyer to supply any customers located in the City of Amarillo or its environs in the State of Texas which Buyer, Panhandle Pipe Line Company or the Amarillo Gas Company now has or may hereafter acquire.

(Def. Ex. 107.)

9. "Natural gas" was defined in the "B" Contract as follows:

VII. The Natural gas delivered hereunder at the gate valves of Seller's wells shall be natural gas as produced in its natural state from the wells.

(Def. Ex. 107.)

10. The contracts referred to in paragraph I(a) of the 1928 "B" Contract and attached to it as Exhibit "E" were the 1918 Little Contract (Def. Ex. 108) and the March 1922 Supplemental Contract (Def. Ex. 109), under which Amarillo Oil sold Panhandle Pipe Line the gas from which Hastings, and later Cannon, had extracted the liquid hydrocarbons in accordance with Amarillo Oil's reserved right to do so.

11. The contract referred to in paragraph I(b) of the "B" Contract and attached to it as Exhibit "F" was an agreement between Amarillo Oil and the United States Zinc Company under which Amarillo Oil was to sell the Zinc Company "dry merchantable gas". (Def. Ex. 107.)

12. In the 1928 "B" Contract Canadian reserved the right to the extraction of helium from the raw gas supplied to Amarillo Oil but did not similarly reserve the right to extract any liquid hydrocarbons from such gas, which indicates all parties' intention

that such liquid hydrocarbons in the "B" gas would belong to Amarillo Oil. (Def. Ex. 107.)

13. The 1928 "B" Contract gave Amarillo Oil the right to buy gas in its natural state ("B" gas), including the liquid hydrocarbons contained therein ("B" liquids), to extract those liquid hydrocarbons, and to sell the processed gas to Panhandle Pipe Line, United States Zinc Company, and any other of its customers in the City of Amarillo or its environs in the State of Texas. (Def. Ex. 107.)

14. The 1928 "B" Contract provided that Amarillo Oil's right to buy raw gas would have first preference and call over any other gas sales by Canadian from the West Panhandle Gas Field, which right was characterized in the agreement as being "in the nature of covenants running with the lands in all hands." (Def. Ex. 107.)

15. The 1928 "B" Contract acquired its name because it was attached as Exhibit "B" to the agreement between Canadian and Colorado Interstate Gas Company ("CIG") executed contemporaneously with the 1928 "B" Contract on June 5, 1928, and called the Cost Contract. The Cost Contract required Canadian to sell gas from the West Panhandle Gas Field to CIG, but provided, unlike the "B" Contract, that Canadian reserved the right to extract both natural gasoline and helium from the gas supplied. (Def. Ex. 106.)

16. Under the 1928 "B" Contract Amarillo Oil secured the right to purchase raw gas necessary to supply Panhandle Pipe Line, United States Zinc Company, and customers of Panhandle, Amarillo Oil Company and Amarillo Gas Company in Amarillo and its environs with gas from which the liquid hydrocarbons had been removed, subject only to Canadian's right to extract helium. Contemporaneously with the 1928 "B" Contract and the 1928 Cost Contract Amarillo Oil executed a third instrument in New York City on June 5, 1928, by which Amarillo Oil assigned its leases in the West Panhandle Field to Canadian, subject to the rights Amarillo Oil had already reserved in the 1928 "B" Contract. (Pl. 1 Ex. 500p.)

17. Prior to the 1928 Assignment to Canadian, Amarillo Oil had already sold the right to extract natural gasoline from gas sold to Panhandle Pipe Line and customers in Amarillo and vicinity to Hastings, who had in turn transferred the right to Cannon.

18. From the time it acquired its extraction right from Amarillo Oil until about 1936, Cannon extracted gasoline and some butane from the "B" gas and paid a percentage of the proceeds to Amarillo Oil.

19. From about 1936 until November 26, 1951, Cannon extracted natural gasoline and butane from the "B" gas and paid a percentage of the proceeds to Amarillo Oil.

20. Canadian never claimed ownership of the "B" liquids and never claimed or received from Cannon any payment for the "B" liquids which Cannon extracted.

21. On November 26, 1951, Amarillo Oil reacquired the right to extract the liquids contained in the "B" gas and also acquired the Cannon plant. (Def. Ex. 112, 113, 114 and 115.) There is no evidence of any performance under the July. 1922 Hastings agreement after November 26, 1951.

22. Amarillo Oil operated the Cannon plant until its new processing plant at Fain was ready for operation in 1952. Thereafter Amarillo Oil operated the Fain plant and extracted gasoline, butane and propane from the "B" gas until January 1, 1975, when Pioneer Gas Products Company, a subsidiary of Pioneer, succeeded to those rights.

23. In 1951 Amarillo Oil's parent, Southwestern Development Company, entered into a preliminary agreement with Canadian and CIG whereby Canadian would be merged with CIG and Canadian would convey its liquid hydrocarbon interests in the West Panhandle Gas Field to Westpan Hydrocarbon Company ("Westpan"), a new company to be formed by Southwestern Development Company.

24. The Federal Power Commission approved this preliminary agreement by Order dated March 1, 1951, 10 F.P.C. 778, and

in an accompanying opinion discussed the liquids to be owned by Westpan and the raw gas to be delivered to Amarillo:

This application was based upon an agreement between Southwestern and Colorado under which Southwestern will transfer all of the stock of Canadian to Colorado, which will thereupon cancel the Canadian stock and effect a merger of the two corporations, which automatically will end the cost contract. In consideration for Canadian's stock, *Colorado* [through its subsidiary Canadian River Gas] *will grant to Southwestern* [through its subsidiary Westpan Hydrocarbon Company] all of the *natural gasoline contained in the natural gas in Canadian's acreage, but subject to continued deliveries of raw gas by Colorado to Amarillo and other Texas customers which Canadian is now contractually obligated to make,* reserving however such gasoline as is contained in the gas which Colorado will deliver to its customers, the gasoline involved in minor deliveries of raw gas which Colorado may in its judgment hereafter make in the producing field, and gasoline represented by prior royalty interests.

*In re Colorado Interstate Gas Co. and Canadian River Gas Co.,* 10 F.P.C. 105 (1951) (emphasis added).

25. With FPC approval the parties then executed a Memorandum of Stipulations on December 26, 1951, one month after Amarillo Oil had reacquired the right to extract the liquids contained in the "B" gas and had acquired the Cannon plant. The 1951 Memorandum of Stipulations provided in part:

*Canadian shall . . . grant to* [Westpan] *all the natural gasoline* (as that term is hereinafter defined and limited) *contained in all of the natural gas now owned by Canadian* through working interests and fee estates in the natural gas leaseholds, natural gas estates, natural gas properties or rights of any description (herein described as "Canadian's acreage") *situated in the West Panhandle Field,* including any extensions or renewals thereof; *less;* however, the raw gas to be delivered to the Fritch Gasoline Plant for processing by Texoma, the natural gasoline contained in minor deliveries of raw gas which may be hereafter made by Colorado at the wells or from the gathering system as may in its judgment be deemed necessary or advisable; *the raw gas to be delivered to Amarillo under its "B" contract with Canadian*; and also natural gasoline represented by a prior royalty interest.

(Def. Ex. 116, ¶ 12(b), emphasis added.)

26. In connection with the extraction of liquid hydrocarbons from gas other than "B" gas contemplated under the 1951 Memorandum of Stipulations, "natural gasoline" was defined in the 1951 Memorandum of Stipulations to mean "all the natural gasoline, butane, propane, and other liquid hydrocarbons other than methane, except such methane as is necessarily removed from the gas in the process of recovering other constituents." (Def. Ex. 116, ¶ 12(g)(i).)

27. The grant of "natural gasoline" provided for in the 1951 Memorandum of Stipulations was accomplished by deed dated December 26, 1951, from Canadian to Westpan, referred to as the 1951 Westpan Deed. (Pl. Ex. 500t.)

28. In this lawsuit Mapco's claims are based exclusively on the 1951 Westpan Deed. (Pl. Ex. 500t.)

29. In the 1951 Westpan Deed Canadian deeded to Westpan all the liquids in the gas produced from specified acreage in the West Panhandle Field, but specifically excluded the liquids in the raw gas being sold to Amarillo Oil under the "B" Contract:

. . . *Canadian River Gas Company . . . does hereby grant,* bargain, sell, transfer, assign, convey and set over unto *Grantee all hydrocarbons* having a boiling point as high and higher than ethane, including without limitation, all ethane, propanes, butanes, pentanes and all heavier hydrocarbons *contained in the natural gas in place* (all hereinafter referred to as "hydrocarbon constituents"), *in and under the lands* and leaseholds hereinafter *described; less, however, only such hydrocarbon constituents required in good faith*

(a) *to be delivered by Grantor to Amarillo Oil Company* (hereinafter called "Amarillo"), its successors and assigns, *under* and pursuant to, and in order to comply with, the terms, as such terms exist at this date, of that certain contract entered into between Grantor and Amarillo, the same being commonly known as *the "B" contract,* which bears date of January 3, 1928, said "B" contract having been last amended on July 11, 1949 . . ..

(Pl. Ex. 500t, emphasis added.)

30. On May 22, 1956, Westpan conveyed an undivided 67.8% of its interest under the 1951 Westpan Deed to Jalco, Inc., which subsequently conveyed its interest to a number of different entities. (Pl. Ex. 501, 593a–s.) Westpan conveyed the remaining undivided 32.2% interest to Amarillo Oil on September 1, 1960. (Pl. Ex. 593o.) There is no evidence that Jalco or any of its successors was related in any way to Amarillo Oil or Pioneer.

31. Neither Westpan nor any of its various successors in interest ever claimed ownership of the "B" liquids or ever claimed or received from Amarillo Oil any payment for the "B" liquids extracted by Amarillo Oil or its assignee until Mapco filed this suit.

32. In a complicated transaction effective September 1, 1963, Mapco acquired all the interest conveyed to Westpan in 1951, and thereby succeeded to the interest of Westpan under the 1951 Westpan Deed.

33. Since 1942 Amarillo Oil or its assignee has filed monthly GP–1 reports with the Texas Railroad Commission reflecting its liquids extraction operation and showing the source of the gas processed, the amounts of gas processed, and the amounts of gasoline, butane and propane extracted.

34. Mapco also files monthly GP–1 reports with the Texas Railroad Commission reflecting its liquids extraction operation at its plant at Fritch, Texas.

35. The GP–1 reports which Amarillo Oil and its assignee filed are readily available to the public upon request and may be ordered by telephone and sent by mail.

36. The GP–1 reports which Amarillo Oil and its assignee filed were in fact obtained by Mapco.

37. The GP–1 reports which Amarillo Oil and its assignee filed from 1953 through 1976 show the single source of the gas processed as CIG.

38. The only gas which CIG delivers to Amarillo Oil at Fain is "B" gas.

39. Mapco has the right to all the liquid hydrocarbons contained in all the gas sold by CIG except "B" gas sold to Amarillo Oil.

40. Mapco is a major United States corporation on the Fortune 500 list. As a sizable part of its business, Mapco produces 15,000 barrels of liquid hydrocarbons per day.

41. Mapco should have known and in fact did know from 1963 on from the GP–1 reports filed by Amarillo Oil and its assignee that the amounts of gasoline, butane and propane stated therein were extracted from "B" gas and only "B" gas.

42. There is no evidence that Amarillo Oil and its assignee ever processed any gas other than "B" gas at the Fain Plant for the extraction of liquid hydrocarbons, or that Amarillo Oil or its assignee ever processed or had the capability to process different streams of gas separately to extract different amounts of liquid hydrocarbons, or that Mapco ever had reason or evidence to think any of these things.

43. Mapco should have known and in fact did know from the GP–1 reports filed by Amarillo Oil and its assignee that substantial amounts of gasoline, butane and propane stated therein were extracted from "B" gas, and that such amounts exceeded the extraction needed to render the "B" gas safely transportable by pipeline.

44. David A. Roach, Mapco's vice president involved in the acquisition of liquid hydrocarbons for transportation and purchased by Mapco compiled information from the *Oil & Gas Journal* showing the amount of gas processed, the production method used, and the amount of liquid hydrocarbons produced by Amarillo Oil Company at the Fain Plant. The *Oil & Gas*

*Journal* is a weekly publication and which is widely distributed in the oil industry. Roach compiled the information from the *Oil & Gas Journal* each year in the form of a memorandum in Mapco's file. (Def. Ex. 96.)

45. Mapco should have known and in fact did know from the information published in the *Oil & Gas Journal* and complied by Roach that substantial amounts of gasoline, butane and propane reported as produced by Amarillo Oil Company at the Fain Plant exceeded the extraction needed to render the gas processed safely transportable by pipeline.

46. Donald B. Ross, Mapco's financial vice president who had a broad and deep knowledge of the entire Mapco situation with regard to the 1928 "B" Contract from 1963 on, prepared a memorandum dated April 28, 1964, which he transmitted to Mapco's president and in which he stated his understanding that no liquid revenue was payable to Mapco on gas delivered to Amarillo Oil under the 1928 "B" Contract. (Def. Ex. 38.)

47. Ross understood at the time he prepared that memorandum that the liquid hydrocarbons produced from the natural gas delivered to Amarillo Oil under the 1928 "B" Contract were owned by Amarillo Oil, and that was his operational assumption from 1963 until 1975.

48. Ross prepared a memorandum dated May 25, 1965, in which he stated his understanding that Mapco had been conveyed the ethane and heavier hydrocarbons except those in gas delivered under the 1928 "B" Contract. (Def. Ex. 9.)

49. Ross understood in 1964 that Amarillo Oil processed all the "B" gas it purchased at the Fain Plant, and nowhere else, for the extraction of liquid hydrocarbons.

50. Throughout the decade of the 1960's Mapco repeatedly stated in its annual reports and prospectuses filed with the Securities Exchange Commission and given to prospective investors that it owned the liquid hydrocarbons in gas in the West Panhandle Gas Field except the liquids contained in gas delivered to Amarillo Oil to supply the City of Amarillo and its environs. (Def. Ex. 122a, 123a, 124a, 125a, 126a, 127a, 128a, and 129a.)

51. Oscar K. Holman, Mapco's vice president from 1963 through 1969, learned within a few months of his initial employment with Mapco that Amarillo Oil was extracting liquid hydrocarbons from "B" gas at the Fain extraction plant and had done so for many, many years.

52. Holman knew of no gas other than "B" gas processed by Amarillo Oil at the Fain Plant.

53. Holman assumed while he was with Mapco that Amarillo Oil was entitled to receive raw natural gas, and what Amarillo Oil did with the gas as far as the extraction of liquids was concerned was Amarillo Oil's business.

54. As far as John Lee Wright, Mapco's vice president in charge of production, knew, from the time he first joined Mapco Amarillo Oil processed all the "B" gas it purchased at the Fain Plant, and nowhere else, for the extraction of liquid hydrocarbons.

55. Wright never knew of any gas other than "B" gas processed by Amarillo Oil at the Fain Plant.

56. Williams Grubbs, Mapco's chief gas processing expert, was not aware of a single extraction plant in the United States that deliberately sets out to extract only enough liquid hydrocarbons to make gas safely transportable by pipeline.

57. In 1965 Amarillo Oil rebuilt its Fain Plant at a cost of $1,500,000.00 and thereafter continued to incur expenses in the operation of the Fain Plant, all in reliance upon its continuing good faith belief, based upon the relevant documents and years of operating history, and upon the absence of any objection by Mapco or its predecessors, that it had the right to extract the liquid hydrocarbons from "B" gas and market them wherever a market could be found.

58. In 1965 Ross learned from Carl Pankratz, Amarillo Oil's vice president that the Fain Plant was being rebuilt to permit the

extraction of more liquid hydrocarbons from the gas supplied to the City of Amarillo and its environs—"B" gas.

59. Ross advised Mapco's president, R. E. Thomas, that the Fain Plant was being rebuilt to permit full extraction of liquid hydrocarbons, including those liquid hydrocarbons Amarillo Oil could extract from the gas supplied to the City of Amarillo or its environs—"B" gas.

60. Mapco should have known and in fact did know when Amarillo Oil rebuilt its Fain Plant in 1965 to permit full extraction of the liquid hydrocarbons in the "B" gas supplied to the City of Amarillo and its environs, that the substantial amounts of gasoline, butane and propane extracted by Amarillo Oil exceeded the extraction needed merely to render the "B" gas safely transportable by pipeline.

61. From 1963 on Mapco knew it was not entitled to the "B" liquids which Amarillo Oil extracted at its Fain Plant, and consequently Mapco directed its efforts on the 1928 "B" Contract toward reducing the benefits received by Amarillo Oil thereunder.

62. Among Mapco's efforts to limit Amarillo Oil's benefits under the 1928 "B" Contract was the "money map" project which Ross initiated in 1964. The goal of the "money map" project was to ensure that the gas which contained the least amount of liquid hydrocarbons would be delivered by CIG to Amarillo Oil at the Fain Plant, where Mapco had no interests in the liquids and could not benefit from production. Under the project, gas which contained a greater amount of liquid hydrocarbons would be delivered to extraction plants at Bivins, Fourway and Fritch, where Mapco had an interest in the liquids extracted.

63. In an attempt to implement the "money map" project, Ross prepared detailed, colored maps showing the concentration of liquid hydrocarbons in the West Panhandle Gas Field and sent them to CIG. With respect to each well in the West Panhandle Gas Field, the maps showed that BTU content, percentage of inerts, and volumes per MCF of gasoline, butane and propane in the gas produced at the wellhead. The most valuable wells from the standpoint of liquids produced were colored yellow on the maps, with the second most valuable colored green, the third orange, and the least valuable colored red.

64. Ross first discussed the "money map" project with CIG on May 13, 1964, and later communicated with CIG about the project on several occasions. Mapco even offered to help finance any changes in CIG's West Panhandle Gas Field gathering system necessary to achieve delivery of the gas leanest in liquid hydrocarbons to Amarillo Oil at the Fain Plant, thereby accomplishing the goal of the "money map" project.

65. In 1964 Ross recommended to Mapco's president, Thomas, that Mapco purchase the Fain Plant and Amarillo Oil's extraction rights. Ross discussed the proposed purchase with Amarillo Oil's vice president, Carl Pankratz. In response Pankratz offered to buy out Mapco's interest in the West Panhandle Gas Field.

66. In 1967 Mapco, CIG, Pioneer and Hill Chemical Company ("Hill Chemical") entered into an agreement whereby CIG would sell Hill Chemical gas from the West Panhandle Gas Field from which the liquid hydrocarbons had been removed. CIG was to receive 20% and Mapco 80% of the liquids extracted from the gas sold to Hill Chemical.

67. The Hill Chemical transaction called for CIG to deliver such substantial quantities of gas to Hill Chemical that the expected life of the West Panhandle Gas Field would be materially shortened. Therefore, the quantity of gas that would ultimately be delivered to Amarillo Oil under the 1928 "B" Contract would be reduced. Such decrease in the ultimate delivery of "B" gas to Amarillo Oil would also reduce the amount of liquids that Amarillo Oil would ultimately recover from the decreased volumes of "B" gas. Mapco paid to Amarillo three-fourths of a cent for each thousand cubic feet of gas delivered to Hill Chemical.

68. In 1963, when Mapco acquired its interest in the West Panhandle Gas Field, Ross, Holman, and Mapco's Board of Directors and other officers all knew that liquid hydrocarbons produced at Amarillo Oil's Fain Plant were sold to Phillips Petroleum Company ("Phillips"), transported to Borger, Texas, for processing, and then sold by Phillips wherever Phillips chose.

69. In 1963 when Mapco acquired its interest in the West Panhandle Gas Field, Mapco knew that "B" liquids extracted by Amarillo Oil at its Fain Plant were sold to Phillips for processing and sale outside the City of Amarillo or its environs.

70. In January 1971 Amarillo Oil ceased selling the liquid hydrocarbons produced at its Fain Plant to Phillips and began selling them to Koch Oil Company ("Koch").

71. Koch and Mapco entered into an agreement which represented that Koch owned, purchased or otherwise controlled all of the liquid hydrocarbons produced at the Fain Plant, and Mapco agreed with Koch to transport the liquid hydrocarbons produced at Fain through Mapco's interstate pipeline to destinations designated by Koch outside the State of Texas. (Def. Ex. 72 and 73.)

72. Since January 1971 Mapco has transported in its interstate pipeline "B" liquids which were produced and which Mapco knew were produced at the Fain Plant, including gasoline, butane and propane, to destinations outside the State of Texas for the account of Koch. Mapco through its personnel has operated the meters controlling the flow of such liquids and kept records of the volumes shipped.

73. Since January 1971 Koch has paid Mapco to transport "B" liquids from the Fain Plant to destinations outside the State of Texas, and Mapco has accepted such tariff payments. Mapco has continued to transport "B" liquids and accept payments therefor throughout the pendency of this lawsuit notwithstanding its claimed ownership of such liquids.

74. Since January 1971 Mapco should have known and in fact did know that the substantial amounts of gasoline, butane and propane extracted from "B" gas at the Fain Plant and transported by Mapco through its own interstate pipeline exceeded the extraction needed to render the "B" gas safely transportable by pipeline.

75. In 1973 Mapco's vice president, Roach, discussed with Pioneer's vice president, Cannon, the purchase by Mapco of the liquids produced at the Fain Plant rather than by Koch.

76. Triggered by the dramatic increase in the price of ethane in 1974, Mapco undertook a study which concluded, in May 1975, that the construction and operation of an ethane extraction plant at Fain for processing "B" gas would be very profitable to Mapco. On April 14, 1975, Mapco's vice president, Wright, met with Amarillo Oil representatives and handed them a letter inquiring as to Amarillo Oil's "specific legal and contractual basis" for extraction of liquid hydrocarbons from gas delivered under the 1928 "B" Contract. (Def. Ex. 600.) Wright also discussed Mapco's proposed ethane plant with Amarillo Oil's representatives.

77. By letter dated May 19, 1975, Amarillo Oil responded to Mapco's inquiry as follows:

[The "B" Contract] gives Amarillo Oil Company the right to process the gas which is delivered to Amarillo Oil Company for the City of Amarillo and its environs. The [1951 Westpan Deed] specifically excludes the hydrocarbons contained in the gas which is delivered to [Amarillo Oil] under the "B" contract. Amarillo Oil Company, or its designee, has for more than 40 years extracted the hydrocarbons from the gas which is delivered under the "B" contract.

(Def. Ex. 601.)

78. On July 31, 1975, Mapco's vice presidents, Wright and Ross, again met with representatives of Amarillo Oil and took the position that Amarillo Oil did not have the right to extract the liquid hydrocarbons from gas delivered under the 1928 "B" Contract.

79. Amarillo Oil rejected Mapco's ethane plant proposal and continued to assert its position that it was entitled to extract the liquid hydrocarbons from "B" gas as it or its assignees had been doing since 1928.

80. As a result of and shortly after Amarillo Oil's rejection of Mapco's ethane plant proposal, Mapco filed this lawsuit.

81. When Mapco asked CIG for its position on Mapco's ethane plant proposal and its claim that Amarillo Oil was not entitled to extract the liquid hydrocarbons from the "B" gas, CIG responded that in view of the numerous provisions contrary to Mapco's position in the pertinent documents, Mapco's position was "astonishing" and "scarcely . . . to be taken seriously." (Def. Ex. 160.)

82. Since 1928 Amarillo Oil or its assignee, in accordance with gas processing technology as it has existed in the industry and developed from time to time, has been extracting liquid hydrocarbons, including gasoline, butane and propane, from "B" gas for the purpose of revenue production and in excess of the volumes of liquid hydrocarbons that must be extracted merely to make "B" gas safely transportable by pipeline.

83. Prior to 1975 neither Mapco nor anyone else ever complained to Pioneer or Amarillo Oil about the processing of "B" gas and the extraction and sale of "B" liquids.

84. Since 1963 when Mapco acquired its interest in the liquid hydrocarbons in the West Panhandle Gas Field, Mapco should have known and in fact did know of the alleged violations of its rights by Amarillo Oil which Mapco now claims. More specifically, since 1963 when Mapco acquired its interest in the liquid hydrocarbons in the West Panhandle Gas Field, Mapco should have known and in fact did know that Amarillo Oil or its assignee processed at the Fain Plant all the gas and only the gas delivered by CIG under the 1928 "B" Contract for the full, commercial extraction of liquid hydrocarbons, including gasoline, butane and propane.

85. Between 1963 and 1975 Mapco's acts were inconsistent with the claims Mapco makes in this lawsuit and evidenced its intention not to assert such claims.

86. Mapco delayed in asserting its claim for an unreasonable length of time causing Amarillo Oil and Pioneer to believe that Mapco had no such claims.

87. Mapco's delay in asserting its claims from 1963 until 1975 makes it unjust for Mapco to prevail in this lawsuit in view of the prejudice suffered by Amarillo Oil due to the substantial expenditures made in reliance on its good faith belief in its right to extract "B" liquids in the absence of any complaint by Mapco and the loss of evidence resulting from a delay of at least twelve years, including the deaths of key witnesses, such as Carl Pankratz and E. C. Wagner, and the loss of important documents and files all relating to Mapco's knowledge of Amarillo Oil's extraction of "B" liquids.

88. Ross understood that the phrase, "in excess of that purchased by Buyer (Amarillo Oil) from other producers", as used in the 1928 "B" Contract, did not require Amarillo Oil to purchase gas from sources other than CIG to supply Amarillo and its environs but simply gave Amarillo Oil the option to do so if it so elected.

89. There is no evidence that Amarillo Oil has received under the 1928 "B" Contract any raw natural gas in excess of the volumes of raw natural gas required in good faith by Amarillo Oil in its business of supplying processed gas to its customers located in the City of Amarillo and its environs in the State of Texas.

90. Amarillo Oil and Pioneer have taken actions customarily required to maintain separate corporate identities for parent and subsidiary corporations.

91. There is no evidence that any processed "B" gas has ever been consumed by customers outside the City of Amarillo and its environs in the State of Texas.

92. Gas sold to Amarillo Oil under the 1928 "B" Contract has always been measured in volumetric units of thousand cubic

feet, as prescribed by the 1928 "B" Contract, and there is no evidence that such gas has ever been measured in thermal units of BTU's for the purpose of determining volumes for delivery under the 1928 "B" Contract.

93. There is no evidence of the specific amount or level of liquid hydrocarbons which must be removed from "B" gas to render the gas safely transportable by pipeline.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction and venue of the cause of action and the parties in this lawsuit, and all necessary parties are before the Court.

2. Under the plain, unambiguous language of the 1928 "B" Contract, read together with the 1951 Westpan Deed and documents contemporaneous to both, Amarillo Oil is entitled to purchase all the raw natural gas produced in its natural state from the wells required by Amarillo Oil to supply processed natural gas to its customers in the City of Amarillo and its environs in the State of Texas.

3. Under the plain, unambiguous language of the 1928 "B" Contract, read together with the 1951 Westpan Deed and documents contemporaneous to both, Amarillo Oil owns the liquid hydrocarbons, including gasoline, butane and propane, contained in the raw natural gas purchased under the 1928 "B" Contract and is entitled to remove such liquid hydrocarbons from the "B" gas and market them in its business discretion.

4. The 1928 "B" Contract contains no express or implied restrictions upon Amarillo Oil's right to extract the liquid hydrocarbons from "B" gas and market them in its business discretion.

5. The 1928 "B" Contract does not impose on Amarillo Oil or Pioneer a duty, either express or implied, to limit its extraction of liquid hydrocarbons from the "B" gas to that necessary merely to make the "B" gas safely transportable by pipeline.

6. Mapco has no right under the 1928 Assignment or the 1951 Westpan Deed to any of the liquid hydrocarbons contained in the "B" gas, because such liquids were specifically conveyed to Amarillo Oil under the 1928 "B" Contract and excluded from the 1951 Westpan Deed, upon which Mapco bases its claims.

7. The acts of all parties in connection with the 1928 "B" Contract since 1928 constitutes a practical construction of the contract affirming Amarillo Oil's right to make normal, commercial extraction of liquid hydrocarbons contained in the "B" gas and market them in its business discretion.

8. Mapco has waived its claims to the "B" liquids by its intentional conduct since 1963 inconsistent with its claims in this lawsuit.

9. Mapco has ratified Amarillo Oil's right to extract and market "B" liquids by executing its agreement with Koch and accepting benefits under that agreement, and by paying Amarillo Oil for the impairment of its extraction right on account of the Hill Chemical transaction.

10. Mapco has consented to Amarillo Oil's extraction and marketing of "B" liquids by its agreement to transport such liquids through its own interstate pipeline for the account of Koch.

11. Mapco's claims are barred by the doctrine of laches.

12. Mapco's claims are barred by the doctrine of estoppel due to its silent, knowing and continued acceptance of benefits from Amarillo Oil's extraction of "B" liquids.

13. Mapco's claims are barred by the two-year statute of limitations for all acts of Amarillo Oil and Pioneer on or before November 20, 1973.

14. Neither Amarillo Oil nor Pioneer has converted any liquid hydrocarbons owned by Mapco.

15. Neither Amarillo Oil nor Pioneer has breached any contract with or other duty to Mapco relating to the "B" liquids.

16. The 1928 "B" Contract does not impose upon Amarillo Oil a duty, either express or implied to purchase any natural gas from producers other than CIG of any

natural gas other than "B" gas to supply customers located in the City of Amarillo or its environs in the State of Texas.

17. Amarillo Oil is and has been entitled under the 1928 "B" Contract to purchase raw natural gas in volumetric units of a thousand cubic feet, as specified therein, rather than in thermal units of BTU's, a unit of measurement to which the 1928 "B" Contract makes no reference.

18. Mapco is not entitled to an accounting, a constructive trust or a resulting trust for the proceeds minus expenses received by Amarillo Oil after September 1, 1963, from the sale of the "B" liquids extracted from the "B" gas processed at the Fain Plant.

19. The knowledge of Mapco's officers is imputed to Mapco.

20. Mapco can effectively obtain in this lawsuit against Amarillo Oil all the relief it desires from 1963 to the present in that Amarillo Oil continues to hold title and ownership of the natural gas which is purchased by Amarillo Oil from CIG under the 1928 "B" Contract and processed for liquids extraction at the Fain Plant effective January 1, 1975.

21. Amarillo Oil and Pioneer are entitled to recover judgment in this action that Mapco take nothing by this action and pay court costs herein.