**Bob BULLOCK, Comptroller of Public Accounts, State of Texas, et al., Appellants,**

**v.**

**MID–AMERICAN OIL & GAS, INC., Successor In Interest To Mid-American Oil Company, a Joint Venture, Appellee.**

**No. 14044.**

Court of Appeals of Texas, Austin.

Oct. 31, 1984.

Rehearing Denied Dec. 5, 1984.

Jim Mattox, Atty. Gen., Maureen Bucek, John M. Gilliland, Asst. Attys. Gen., Austin, for appellants.

Jerry P. Jones, Emily A. Parker, Thompson & Knight, Dallas, for appellee.

Before SHANNON, EARL W. SMITH and BRADY, JJ.

BRADY, Justice.

The appellee, Mid-American, sued the State for a refund of $1,210,145 in occupation taxes which Mid-American had paid under protest. The trial court sitting without a jury decreed that the State must refund $1,206,945, and Bob Bullock, Comptroller, appeals. We will affirm the judgment of the trial court.

During 1973, William and Mary Borchers as lessors, executed two oil and gas leases with Wayne S. Davis and Gerald R. Hill as lessees, on land situated in Lavaca County. Another lease in the same field was executed by Dorothy Borchers Ploeger as lessor, with Gerald R. Hill, as lessee. These leases will be referred to as the "Hill Group." Subsequently, the "Hill Group" negotiated a gas sales contract with Bay Pipeline, Inc., which at the time was a wholly-owned subsidiary of Mid-American, with the provision that Bay would pay sixty-five cents per MCF for the first five years. In order to take delivery of the gas, Bay constructed a pipeline. Delivery of gas per the contract was on the Borchers' leases. The Ploeger lease provided for the sale of gas at the same price.

In October of 1974, Mid-American purchased from the Hill Group all of their interest under these leases except for 21.875% of the Ploeger contract. This sale had the effect of making Mid-American both a seller and an operator under the leases. In December of 1974, Mid-American sold its assets to a new entity called "Mid American Oil Company, a Joint Ven-

ture." At the same time, Bay Pipeline declared and paid a dividend to its parent, Mid-American, of all its rights to the gas sales contracts it had acquired from the Hill Group. Thus, the Joint Venture acquired all of Bay's rights as buyer and seller of the natural gas. It is stipulated by the parties that the contracts were to remain in force as originally written.

Thereafter, effective July 1, 1975, the Joint Venture contracted to sell gas to Lo-Vaca and others at $1.90 per MCF. In order to deliver the gas, Bay extended the pipeline to a delivery point within Lo-Vaca's pipeline. The record reveals that there were forty-three separately described gas leases located in seven different counties involved in these resales. In 1976, the Joint Venture was dissolved, the present appellees succeeded to the Joint Venture's interest under the Borchers and Ploeger leases, and Bay Pipeline reacquired its rights as buyer under the gas sales contracts. The State Comptroller audited Mid-American. The audit resulted in an assessment of taxes between December 4, 1974, and May 31, 1976, based on a price of $1.90 per MCF, instead of the previously assessed sales price of sixty-five cents per MCF. Though there were other leases involved in this case, they are not necessary to this opinion. Due to the factual similarity between these other leases and the Hill Group leases, and for the sake of simplicity, they need not be addressed.

The thrust of appellants' nine points of error is that the trial court erred in concluding that sales made by Mid-American as a producer of natural gas to Lo-Vaca and others at $1.90 were second sales, and that the correct price on which to base the occupation tax was sixty-five cents as per the original contracts. The State argues that appellee's sale as a gas producer to itself as a "first purchaser" and a subsequent sale to others at a higher price would contravene the intent of the Legislature when it enacted the occupation taxes. Since the first sale by Mid-American did not involve any cash payment, the Comptroller says, the subsequent sales to Lo-Vaca were first sales. However, the find-ings of fact and conclusions of law made by the trial court correctly stated that the Joint Venture's first sale of gas produced from the leases in question from the period of December 4, 1974, through May 31, 1976, was "made at the mouth of the well." Additionally, this was the proper measure of the market value of the gas for occupational tax purposes.

The statute involved is Tex.Tax Gen.Ann. art. 3.02 (1969) ([repealed by 1981 Tex.Gen. Laws, ch. 389, § 39(a), at 1785] and codified as Tex.Tax.Code §§ 201.101–201.104 (1982), effective January 1, 1982), which provided:

Art. 3.02:

(1) The market value of gas produced in this State shall be the value thereof at the mouth of the well; however, in case gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts.

Art. 3.04:

(1) For the purpose of this Act "producer" shall mean any person owning, controlling, managing, or leasing any gas well and/or any person who produces in any manner any gas by taking it from the earth or waters in this State, and shall include any person owning any royalty or other interest in any gas or its value whether produced by him, or by some other person on his behalf, either by lease, contract or otherwise.

(2) "First purchaser" shall mean any person purchasing gas from the producer.

(3) "Subsequent Purchaser" shall mean any person who purchases gas for any purpose whatsoever, when said gas is purchased from any person other than the producer.

In determining the occupational tax provided for under the occupational tax statute, it is clear the taxes attach when "the minerals have been produced and severed from the land, when they have been reduced to possession and have come under the dominion and control of the producer." *Humble Oil and Refining Company v. Calvert*, 478 S.W.2d 926, 931 (Tex.1972). The tax involved herein is a tax only upon

the occupation of producing gas. *Id., W.R. Davis, Inc., v. State,* 142 Tex. 637, 180 S.W.2d 429 (1944); *State v. Humphrey,* 159 S.W.2d 162 (Tex.Civ.App.1941, no writ). Any tax levied is upon the market value of the gas when it is produced. *Francitas Gas Co. v. Calvert,* 332 S.W.2d 389 (Tex. Civ.App.1960, writ ref'd n.r.e.). Taxing the price of gas subsequent to delivery would result in a tax on other activities, such as gathering, instead of purely on production. This would be a tax outside the scope of the Texas occupational gas tax statute. As the Court has said before, "The producer thereof only is taxed, not the refiner." *W.R. Davis, Inc. v. State, supra.*

■ The difficult question in this case, however, is how to determine the market value of the gas in order to apply properly the occupational gas tax. The general rule is that market value is determined by the contract of sale between the producer and the purchaser. This rule holds true as long as the contract is an arms length transaction, free from fraud or collusion. *W.R. Davis, Inc. v. State, supra; Calvert v. Union Producing Co.,* 402 S.W.2d 221 (Tex.Civ.App.1966, writ ref'd n.r.e.). In the *Calvert* case, the Court found that the State had failed to establish the presence of fraud, collusion, or lack of good faith. The Court held the contract thus entered into was the measure of the market value of the gas for tax purposes even though all the contracting parties were run as a single business enterprise under the control of the parent. The original contract of sale in the instant case was entered into by completely unrelated parties. Additionally, the State did not raise the issue of fraud, collusion, or lack of good faith in the formation of the contract. In fact, the Comptroller concedes the contracts at issue were entered into in good faith and free from fraud or collusion.

■ The first sale contracts remained in force and did not terminate on December 4, 1974, the effective date of the formation of the joint venture. They continued to be binding contracts for the sale and purchase of gas. The owners of the 21.875% working interest under the Ploeger lease were allowed to pay their taxes during the period in which the joint venture existed based upon the price for gas as set forth in the first sale contracts. Likewise, the Comptroller determined that after May 31, 1976, the effective date of the joint venture's dissolution, the tax for the successor in interest to the joint venture would again be based on the price for gas as set forth in the original contract. Thus, the price for gas as reflected by the original contract establishes the market value for occupational tax purposes.

■ The purpose of the statute in question is to place a tax on the "market value" of gas at the well head. This is supported by phrases in the statute such as "the market value thereof as and when produced", "the value thereof at the mouth of the well", and producer means any person who produces gas "by taking it from the earth." The Texas cases cited by appellant defining "market value" as "gross cash receipts" we do not find controlling.

■ Gross cash receipts do not control where they clearly do not reflect the true market value of the gas at the mouth of the well. The case of *Humble Oil and Refining Company v. Calvert, supra,* defined "market value" as the cash price received by the producer when the gas was sold *at the well head.* As the producer's "gross cash receipts" do not represent a sale at the well head the second sale should not control. The term "gross cash receipts" must yield to the term "as and when produced" and "at the mouth of the well." Even conceding that there are apparent conflicts within the taxing statute, all doubts are to be resolved in favor of the taxpayer. *United States v. Merriam,* 263 U.S. 179, 44 S.Ct. 69, 68 L.Ed. 240 (1923).

■ Gross cash receipts realized by a "producer" from operations apart from the "production" of gas are not part of the producer's "gross cash receipts" for purposes of gas occupation taxes. *Humble Oil and Refining Company v. Calvert,* 464 S.W.2d 170, 175 (Tex.Civ.App.1971), aff'd, 478 S.W.2d 926 (Tex.1972). The tax

is upon a producer's production of gas and is measured by the "gross income" from production operations considered separately from other activities. *Id. Humble Oil and Refining Company v. Calvert, supra.* These "other activities" obviously refer to the gathering of gas and other related aspects of gas marketing.

■■■■ The occupational gas tax is not necessarily a tax on the production and *cash* sale of gas, as the Comptroller seems to argue. In citing the case of *Francitas Gas Co. v. Calvert, supra* in support of his position, appellant fails to recognize that the residue gas in that case had not been "produced and saved." The facts showed the "producer" had extracted gas from a well and removed certain hydrocarbons, then returned the residue gas back into the well. The hydrocarbons were taxed but not the residue gas because an exception was provided by § 1(2) of the old occupational gas statute, art. 7047b, Tex.Rev.Civ. Stat. (1951 Tex.Gen.Laws, ch. 402, § V, at 700, repealed by the adoption of art. 3.02, *supra*), the substantially identical predecessor statute to art. 3.02. It specified that when products are extracted from gas and the residue returned to a gas producing formation the rate of the tax would be restricted to the value of the extracted products. The Court in *Francitas* taxed the residue gas once it was again extracted for sale, at its *market value.* Apparently, the Court reasoned that during the period of time the residue gas was returned to the gas producing formation it had no market value. At most, it was in storage and was not "saved." In the instant case, the gas was produced and "saved." It was also sold pursuant to a valid and binding contract. At the time of sale it had a definite "market value" and that was the proper value with which to measure the amount of the tax.

Appellants strongly urge that the rights of a seller and a buyer pursuant to a gas sales contract must remain in separate corporate entities for the prices set forth in the contract to control the market value the tax will be set against. It is appellants'

contention that the joint venture, being a single corporate entity, existed as both a seller and a buyer, and that a true "sale" of gas did not occur until the joint venture sold gas to customers under the Lo-Vaca contract. Further, they argue that the gross cash receipts realized at that time should be the market value for tax purposes. In support of this contention appellants cite the case of *Texaco, Inc. v. Calvert,* 526 S.W.2d 630 (Tex.Civ.App.1975, writ ref'd n.r.e.). We find this case not dispositive of the issues in the case at bar. The *Texaco* case involved a franchise tax, and payment for the privilege of transacting business within Texas. Texaco could not include the gross receipts of subsidiaries in the tax calculations because the subsidiaries are separate corporate entities. This does not compare with a tax on the business of producing gas computed on the market value of the gas.

■■■ Support for our holding that the original contract represents the market value of the gas for tax purposes can be found in the case of *Humble Oil and Refining Company v. Calvert, supra.* There, the Texas Supreme Court noted the similarity between Section 613 of the Internal Revenue Code of 1954, and the Texas occupational tax statute as it then existed. Gross income from depreciated oil and gas property was defined in the income tax regulations, § 1.613–3, as follows:

> In the case of oil and gas wells, gross income from the property, as used in section 613(C)(1), means the amount for which the taxpayer sells the oil or gas in the immediate vicinity of the well. If the oil or gas is not sold on the premises but is manufactured or converted into a refined product prior to sale, or is transported from the premises prior to sale, the gross income from the property shall be assumed to be equated to the representative market or field price of the oil or gas before conversion or transportation.

The Court, in noting the definition of gross income was applicable only in the context of federal taxation found the concept too

close to that in the occupational tax statute to not find it persuasive. It is our opinion that this comparison can be followed in the case at bar. This dispels the view taken by appellants that they had already taken into account the costs of refining and "gathering" before they levied the tax on the $1.90 price for gas found in the contract with Lo-Vaca. The sixty-five cent price found in the original contract is the representative market or field price of the gas before transportation or conversion. Though the appellee was named as a "producer" in the second sale contract, it has no effect in this case. Despite the name attributed to the parties in the contract, the market value of the gas at the well head remained unchanged.

The judgment of the trial court is affirmed.

EARL W. SMITH, J., not participating.