**AMERADA HESS CORPORATION, a foreign corporation, Plaintiff, Appellant, and Cross-Appellee,**

v.

**Kent CONRAD, Tax Commissioner of the State of North Dakota, Defendant, Appellee, and Cross-Appellant.**

Civ. No. 11351.

Supreme Court of North Dakota.

June 30, 1987.

Thompson & Knight, Dallas, Tex., and Fleck, Mather, Strutz & Mayer, Bismarck, and David Castro, Amerada Hess Corp., Tulsa, Okl., for plaintiff, appellant, and cross-appellee; Jane Fleck Romanov (argued).

Tobyn J. Anderson, Asst. Atty. Gen., North Dakota State Tax Dept., Bismarck, for defendant, appellee, and cross-appellant.

LEVINE, Justice.

Amerada Hess Corporation (Amerada) appeals from a declaratory judgment addressing various questions arising from the North Dakota Tax Commissioner's (Commissioner) assessment of additional oil and gas gross production taxes, penalties, and interest against Amerada. The Commissioner has filed a cross-appeal from a part of the judgment. We affirm in part and reverse in part.

■■■ On June 4, 1985, the Commissioner issued to Amerada a Notice of Determination assessing additional gross production taxes, penalties, and interest in the total amount of $10,931,468, covering a ten-year period from January 1975 through December 1984. Amerada filed an administrative complaint objecting to the assessment and filed a declaratory judgment action in district court. In connection with the district court action, Amerada sought and obtained a writ of prohibition restraining the Commissioner from pursuing the administrative action until Amerada's claim for declaratory relief had been resolved.[1]

---

1. Early in these proceedings the Commissioner sought a dismissal of Amerada's declaratory judgment action and a remand of the case for an administrative hearing based on principles of exclusive jurisdiction, primary jurisdiction, and exhaustion of administrative remedies. No issue is raised in this appeal regarding the propriety of the district court's issuance of the writ of prohibition under Chapter 32–35, N.D.C.C., or the court's acceptance of the case for declaratory relief under Chapter 32–23, N.D.C.C.

While the procedure used by Amerada appears to be the same used by the taxpayers in *Blocker Drilling Canada, Ltd. v. Conrad,* 354 N.W.2d 912, 914–915 (N.D.1984), the issues raised and decided by the district court in this case go far beyond the single estoppel issue raised and decided in *Blocker Drilling* and, as will become evident in our decision, this declaratory judgment does not dispose of many underlying disputes. We have recognized that "[c]ourts may, under proper circumstances, grant declaratory relief even though the declaration would not terminate the underlying controversy, if it can be of some help to end the controversy." *Aberle v. Karn,* 316 N.W.2d 779, 782 (N.D.1982). However, the court in its discretion may refuse to render a declaratory judgment where it would not terminate the uncertainty or controversy giving rise to the proceeding [§ 32–23–06, N.D.C.C.], and this court has noted that:

> " 'We do not favor or encourage, nor can we sustain, bifurcated self-induced or self-initiated procedures, one in the administrative process and one in the judicial process covering the same legal questions.
>
> " 'If such bifurcated procedures were encouraged or sustained, it would create duplication, and uncertainty, and waste manpower and money, with no appreciable result, and all without improving the administration of justice.' " *Transportation Division of Fargo Chamber of Commerce v. Sandstrom,* 337 N.W.2d 160, 163 (N.D.1983) [quoting *Shark Bros., Inc. v. Cass County,* 256 N.W.2d 701, 705 (N.D.1977) ].

We believe that courts should strive to avoid granting declaratory judgments if to do so would entail piecemeal litigation of the matters in controversy. "It is not the intent of the declaratory judgment statute to confer jurisdiction on the courts to be legal advisers." *Farmers Insurance Group v. Harris,* 4 Ill.App.3d 372, 279 N.E.2d 789, 791 (1972).

Amerada asserted that the Commissioner was estopped by his conduct from assessing additional taxes, penalties, and interest; that the Commissioner was barred by the six-year statute of limitations in § 28–01–16(2), N.D.C.C., from making any assessment for the period before January 1, 1979; that the Commissioner had misinterpreted the meaning of "gross value at the well" under § 57–51–02, N.D.C.C.; and that the Commissioner erroneously denied it a tax exemption under § 57–51–05(3), N.D.C.C., for residue gas used as a lease fuel.

Through two decisions rendered on motions for partial summary judgment, the court determined that the Commissioner was not estopped under the circumstances of this case but held that the six-year statute of limitations is applicable to an assessment for additional taxes, penalties, and interest under Chapter 57–51, N.D.C.C. The court also ruled that residue gas is ineligible for the tax exemption. The court further ruled that the term "gross value at the well" as used in § 57–51–02, N.D.C.C., means "the fair market value of the gas at the time of production," and that although the "selling price of gas normally fixes its fair market value, . . . in cases where the selling price does not reflect fair market value, the Tax Commissioner may require the tax to be paid upon the price prevailing at the time of production." The court also stated that "where there is no price prevailing at the time of production, the Tax Commissioner may use any method of valuing gas that is reasonably calculated to arrive at the fair market value," and that "questions of the fair market value of gas and the price prevailing at the time of production are administrative questions to be resolved initially in the administrative process." These appeals followed.

## I. GROSS VALUE AT THE WELL

Some background is helpful at this point. The gas subject to the assessment in this case is produced by Amerada and has been processed at the Tioga Gas Processing Plant in Williams County since 1955. Under a March 4, 1953, construction agreement between Amerada and Signal Oil and Gas Company (Signal), Signal agreed to build the plant essentially to process gas produced by Amerada from the area surrounding the facility. Although Signal owned and operated the plant, the agreement provided that Amerada would receive 50 percent of the net income from the plant after Signal recovered its costs of construction. On January 1, 1961, Signal conveyed a 50 percent interest in the plant to Amerada, and Signal later sold its remaining 50 percent interest in the plant to Aminoil, U.S.A., Inc.

In determining the value of the gas, Amerada has based its calculations on the pricing terms and provisions contained in its January 1, 1961, gas processing contract with Signal.[2] The Commissioner based his assessment on the fair market value of the gas at the time of production and used the "work-back" method [3] to arrive at his calculations. The issue is which of these methods of valuing gas is authorized by our gross production tax laws under the circumstances presented.

---

Although we have doubts about the propriety of the procedure used in this case, our refusal to address the issues raised would only augment the waste of judicial resources this procedure has fostered.

2. Amerada claims that, "for reasons of administrative ease and efficiency," it actually elected to make its gross production tax payments on the same valuation basis as its royalty payments under a Natural Gas Royalty Agreement which Amerada entered into "with its royalty owners, including the State of North Dakota, covering production attributable to an area designated in the Royalty Agreement as the 'Plant Area.'" According to Amerada, this "has resulted in the use of a value for tax purposes greater than the

value actually received pursuant to the Signal Agreement. . . ."

3. The "work-back valuation method" has been defined as:

"A method for calculating market value of oil or gas at the well-head when value cannot be calculated on the basis of comparable sales. Under this method costs of transportation, processing and treatment are deducted from the ultimate proceeds of sale of the oil or gas and any extracted or processed products to ascertain well-head value. . . ." 8 Williams and Meyers, Oil and Gas Law, Manual of Terms, at pp. 977–978 (1984).

In *Rocky Mountain Oil & Gas Ass'n v. Conrad*, 405 N.W.2d 279, 281 (N.D.1987), we stated:

"Our standard of review of a judgment declaratory in nature is the same as in any other case. NDCC § 32–23–07; *American Hardware Mutual Ins. Co. v. Dairyland Ins. Co.*, 304 N.W.2d 687, 689 (N.D.1981). The interpretation of a statute is a question of law, fully reviewable by this Court. *Ladish Malting Co. v. Stutsman County*, 351 N.W.2d 712, 718 (N.D.1984). In determining the meaning of statutes, the primary objective is to ascertain the intent of the Legislature. *Ladish Malting Co., supra.* The legislative intent must first be sought from the language of the statute; however, if a tax statute is ambiguous so that the legislative intention with respect to the meaning of the statute is doubtful, the doubt must be resolved in favor of the taxpayer. *Ladish Malting Co., supra.*"

The relevant statutory provisions at issue are §§ 57–51–02 and 57–51–05(4), N.D. C.C.:

"*57–51–02. Gross production tax.* A tax of five percentum of the gross value at the well is hereby levied upon all oil and gas produced within the state of North Dakota, less the value of any part thereof, the ownership or right to which is exempt from taxation. The tax hereby levied shall attach to and is hereby levied upon the whole production, including what is commonly known as the royalty interest."

"*57–51–05. Payment of tax on quarterly basis—When tax due—When delinquent—Payment by purchaser—By producer—How casinghead gas taxed.*

\* \* \* \* \* \*

"4. In case oil or gas is sold under circumstances where the sale price does not represent the cash price thereof prevailing for oil or gas of like kind, character or quality in the field from which such product is produced, the commissioner may require the said tax to be paid upon the basis of the prevailing price then being paid at the time of production thereof in said field for oil, or gas of like kind, quality, and character."

The parties agree that the phrase "gross value at the well" as used in § 57–51–02, N.D.C.C., means the fair market value of the gas. The parties' disagreement is over the method for determining the fair market value of the gas when it is sold pursuant to a long-term purchase contract. Relying upon *Apache Gas Products Corp. v. Oklahoma Tax Comm'n*, 509 P.2d 109 (Okla. 1973), Amerada asserts that where the contract price reflects the highest price obtainable for gas of like kind, quality and character in the field at the time the contract was entered into, the contract price exclusively establishes the fair market value of the gas for gross production tax purposes.

In *Apache*, the Oklahoma Supreme Court interpreted the provisions of the Oklahoma gross production tax law, Okla.Stat.Ann. tit. 68, § 1009, from which our law was modeled. *See Federal Land Bank of St. Paul v. State*, 274 N.W.2d 580, 582 (N.D. 1979). The court determined that the wording of Oklahoma's statutory counterpart to § 57–51–05(4), N.D.C.C.,

"... when interpreted in the light of the realities of the natural gas industry (such as necessity for long term contracts, necessary time lag between initial, and later, sales under such contracts, and inevitable effect of increased demand, during such contract periods, upon current or prevailing gas prices generally) can only mean that the Commission 'may require' the tax to be paid on the basis of prevailing price in the field *at the time of production ONLY in cases where the prices (already) paid are less than the prices that prevailed in the field at the time said sale prices were contracted for.*" *Apache, supra,* 509 P.2d at 113 [Emphasis in original].

The court thus concluded that the gross production tax should be measured by "the gross proceeds realized by each producer from his individual sales contracts, except where the conditions under which a particular contract was entered into were such as not to reflect arm's length bargaining...." *Apache, supra,* 509 P.2d at 116.

In situations where a North Dakota statute is derived from a statute in another jurisdiction, judicial interpretations of the foreign statute may be persuasive authority in interpreting our statute, but they are not binding on this court. *Loken v. Magrum*, 380 N.W.2d 336, 339 (N.D.1986). In this instance we find *Apache* unpersuasive and decline to follow it.[4]

Having reviewed the provisions of Chapter 57-51, N.D.C.C., we believe that the Legislature intended to levy the gross production tax on the current fair market value of the gas produced regardless of whether the gas is sold pursuant to a long-term purchase contract. *Cf. Teavee Oil & Gas, Inc. v. Hardesty*, 297 S.E.2d 898, 900–901 (W.Va.1982). Section 57-51-02, N.D.C.C., the statute which actually imposes the gross production tax, provides that the tax is levied on the gross value at the well of all oil and gas produced in the state. The tax is levied on all oil and gas produced regardless of whether the gas or oil is sold to a purchaser. *See* § 57-51-05(2), N.D.C.C. The tax is due and payable shortly after production, *see* § 57-51-05(1), N.D.C.C., and the person paying the tax is required to report "[t]he prevailing market price of oil or gas sold at time of production; ..." § 57-51-06(1)(e), N.D.C.C.

Section 57-51-05(4), N.D.C.C., specifically authorizes the Commissioner to require the tax to be paid "upon the basis of the prevailing price then being paid at the time of production thereof in said field for oil, or gas of like kind, quality, and character" in situations where the oil or gas is "sold under circumstances where the sale price does not represent the cash price thereof prevailing ... in the field from which such product is produced." Rather than authorizing a different procedure for determining the market value of gas when it is sold pursuant to long-term contracts, we believe this section merely recognizes that the actual purchase price is generally one of the best indicators of fair market value, *i.e.,* "the highest price for which property can be sold in the open market by a willing seller to a willing purchaser, neither acting under compulsion and both exercising reasonable judgment." *Hultberg v. Hjelle*, 286 N.W.2d 448, 452 (N.D.1979).[5]

Furthermore, it is the majority rule that the term "market value" refers "to market value at the time of production and delivery rather than when the applicable sale contract was made." *Piney Woods Country Life School v. Shell Oil Co.*, 726 F.2d 225, 233 (5th Cir.1984), *cert. denied,* 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985),

---

4. We also find unpersuasive the Texas decisions Amerada relies upon for the proposition that value is conclusively determined by the sales contract between the producer and the purchaser if the contract is an arm's length agreement. *See Bullock v. Mid-American Oil & Gas, Inc.,* 680 S.W.2d 612 (Tex.Ct.App.1984); *Calvert v. Union Producing Company,* 402 S.W.2d 221 (Tex.Civ. App.1966); *W.R. Davis, Inc. v. State,* 142 Tex. 637, 180 S.W.2d 429 (1944). The Texas statute, which differs significantly from our gross production tax law, is set forth in *Bullock, supra,* 680 S.W.2d at 615:

"The statute involved is Tex.Tax Gen.Ann. art. 3.02 (1969) ( [repealed by 1981 Tex.Gen. Laws, ch. 389, § 39(a), at 1785] and codified as Tex.Tax.Code §§ 201.101–201.104 (1982), effective January 1, 1982), which provided:
"Art. 3.02:
"(1) The market value of gas produced in this State shall be the value thereof at the mouth of the well; however, in case gas is sold for cash only, the tax shall be computed on the producer's gross cash receipts."
The Texas statute specifically defines market value in cases where gas is sold for cash only.

Construing a similar predecessor statute, the court in *W.R. Davis, Inc., supra,* 142 Tex. at 643, 180 S.W.2d at 432, recognized that by defining market value as the price for which a producer sells the gas, "[i]t is very evident that the Act does not use the term 'market value' in its ordinary legal sense."

5. The dissent appears to argue that absent the promulgation of a rule, the Commissioner may not correct his prior erroneous construction of statutes. We do not believe the law to be so unyielding. See 2 K. Davis, Administrative Law Treatise, § 7:25 (2d. Ed., 1982 Supp.). Our conclusion that the gross value at the well means value at the time of production is based upon our construction of the statutes in Chapter 57–51, N.D.C.C. That the Commissioner only recently afforded the statutes their correct meaning cannot in our view foreclose him from properly enforcing them.

The dissent's argument is simply an argument for estoppel cloaked in the shroud of "no rule, no tax." It is the statutes that govern, and any rule on the subject would simply echo the statutes as we have construed them.

and cases cited therein.[6] We conclude that the trial court correctly ruled that our gross production tax is not conclusively based on the actual contract price of gas produced and sold but is measured by the current market value of the gas at the time it is produced.

■■■ Amerada asserts that the trial court erred in refusing to void the Commissioner's assessment because the assessment "is based on a method of calculating value [the work-back method] that the court found to be invalid and impermissible in the circumstances." Amerada has misinterpreted the trial court's ruling. The court did not hold that the work-back method was inappropriate under the circumstances, but essentially ruled that the efficacy of the work-back method in this case must await resolution of factual matters in the administrative proceeding. The trial court correctly concluded that "questions of the fair market value of gas and the price prevailing at the time of production are administrative questions to be resolved initially in the administrative process,"[7] and that "where there is no price prevailing at the time of production, the Tax Commissioner may use any method of valuing gas that is reasonably calculated to arrive at the fair market value of the gas, which may include the workback method." At this stage of the proceedings the trial court had no basis to void the Commissioner's assessment.

## II. RESIDUE GAS

Amerada asserts that the trial court erred in holding that residue gas it used as a lease fuel is ineligible for the tax exemption provided in § 57–51–05(3), N.D.C.C. We agree.

Section 57–51–05(3), N.D.C.C., provides:

"3. Gas when produced and utilized in any manner, except when used for fuel or otherwise used in the operation of any lease or premises in the drilling for or production of oil or gas therefrom, or for repressuring thereon, shall be considered for the purpose of this chapter, as to the amount utilized, as gas actually produced and saved."[8]

■■■ The Commissioner asserts that residue gas used as a lease fuel does not qualify for the exemption because "gas" is defined in § 57–51–01(3), N.D.C.C., as meaning only "natural gas and casinghead gas." While a tax exemption statute is subject to strict construction, *Rocky Mountain Oil & Gas Ass'n v. Conrad, supra,* 405 N.W.2d at 283, we have recognized words describing the object of a tax exemption will be given a liberal and not a harsh or strained construction to obtain a reasonable result effectuating the legislative intent in providing a tax exemption. *Ladish Malting Co. v. Stutsman County,* 351 N.W.2d 712, 718 (N.D.1984). All this means is that we will avoid a crimped con-

6. Amicus curiae Rocky Mountain Oil and Gas Association asserts that royalty clause cases such as *Piney Woods Country Life School v. Shell Oil Co.,* 726 F.2d 225 (5th Cir.1984), *cert. denied,* 471 U.S. 1005, 105 S.Ct. 1868, 85 L.Ed.2d 161 (1985), are inapplicable for determining the meaning of gross value at the well under our gross production tax statutes because there is a duty owed to royalty owners which is not owed to tax authorities. However, when we interpret either statutes or contracts the same general rule applies. *See* § 1–02–02, N.D.C.C. ["Words used in any statute are to be understood in their ordinary sense...."]; § 9–07–02, N.D.C.C. ["The language of a contract is to govern its interpretation...."]; *Johnson v. Mineral Estate, Inc.,* 343 N.W.2d 778, 780 (N.D.1984) ["The same general rules that govern interpretation of contractual agreements apply to oil and gas leases."] We believe that *Piney Woods* is therefore helpful in determining the meaning of market value under the circumstances.

7. Amerada asserts that federal price controls must be taken into account in determining the value of gas and the prevailing cash price and that the trial court erred in failing to rule on the issue. The Commissioner, however, has conceded that the regulatory vintage of the gas must be taken into account in determining its value.

8. Effective August 1, 1986, § 81–09–02–16 of the North Dakota Administrative Code provides:

"*81–09–02–16. Exemption for lease use gas.* Gas used for production purposes on the lease from which it was produced is exempt. This exemption does not include gas that has been processed in any manner.

"'Processed', as used in this section, does not include gas that has passed through a heater-treater, or other similar device, commonly used at the well site by the producer."

struction in the name of strict construction. We will interpret language purposively in a manner that does not wreak havoc either with the meaning the words will bear or with the intent of the Legislature.

"Natural gas" has been defined as:

"Hydrocarbons which at atmospheric conditions of temperature and pressure are in a gaseous phase.

\* \* \* \* \* \*

"Pruitt, 'Mineral Terms—Some Problems in Their Use and Definition,' 11 *Rocky Mt. Min. L. Inst.* 1 at 16 (1966), has remarked that:

" 'The ordinary rarefied or gaseous hydrocarbons found in the earth are referred to generally as "natural gas." Non-combustible natural gases occurring in the earth, such as carbon dioxide, hydrogen sulphide, helium and nitrogen, are generally referred to by their proper chemical names. Often, however, non-combustible gases are found in combination with combustible gases and the mixture is referred to generally as "natural gas," without any attempt to distinguish between the combustible and non-combustible gases.' " 8 Williams and Meyers, Oil and Gas Law, Manual of Terms, at p. 528 (1984).

"Residue gas" is the "[g]as remaining after processing in a separator or other plant which removes liquid hydrocarbons contained in the gas when produced." 8 Williams and Meyers, *supra,* at p. 751. *See also Rocky Mountain Oil & Gas Ass'n v. Conrad, supra,* 405 N.W.2d at 280. It is the "gas which remains after such elements as propane, butane, and gasoline have been removed." *Read v. Britain,* 414 S.W.2d 483, 487 (Tex.Civ.App.1967).[9]

We believe the Commissioner's argument that "residue gas" does not qualify as gas stultifies the language and purpose of the exemption statute. The term "natural gas" has been interpreted to include all of the constituent elements contained therein. *See Mapco, Inc. v. Pioneer Corp.,* 447 F.Supp. 143, 147 (N.D.Tex.1978), *aff'd,* 615 F.2d 297 (5th Cir.1980); *Lone Star Gas Co. v. Harris,* 45 S.W.2d 664, 667 (Tex.Civ.App. 1931); *Lone Star Gas Co. v. Stine,* 41 S.W.2d 48, 49 (Tex.Com.App.1931). For purposes of the exemption statute, we do not believe that "natural gas produced from the earth ... is changed into something different because of the fact that after it is taken from the well it is cleaned up and processed...." *Natural Gas Pipe Line Co. of America v. Panoma Corp.,* 271 P.2d 354, 361 (Okla.1953), *reversed on other grounds,* 349 U.S. 44, 75 S.Ct. 576, 99 L.Ed. 866 (1955).

Moreover, were we to conclude that the Legislature did not intend to exempt residue gas used as a lease fuel, it would lead to the anomaly that the Legislature acted to encourage unlawful waste of natural resources. If only casinghead gas, containing valuable liquid hydrocarbons, qualified for the exemption, casinghead gas would undoubtedly be used for lease operations and the liquid hydrocarbons, which are generally unnecessary for lease operation purposes, would be consumed and lost rather than being saved and marketed. This result could arguably be considered a form of physical waste [*see* §§ 38–08–02(15)(a) and 38–08–03, N.D.C.C.; § 43–02–03–06, N.D. Adm.Code; 8 Williams and Meyers, *supra,* at p. 955], thereby subjecting the producer to a substantial civil penalty [*see* § 38–08–16, N.D.C.C.]. The Legislature could not have intended to require a producer to violate state law in order to be entitled to a tax exemption.

These considerations lead us to the conclusion that the obvious purpose of § 57–51–05(3), N.D.C.C., is to provide a tax exemption for gas used in lease operations

---

9. "Casinghead gas" has been defined as:
"Gas produced with oil in oil wells, the gas being taken from the well through the casinghead at the top of the well, as distinguished from gas produced from a gas well. Casinghead gas contains liquid hydrocarbons in solution which may be separated in part by a reduction in pressure at the well head and which may be separated more completely in a separator, absorption plant or by other manufacturing process." 8 Williams and Meyers, Oil and Gas Law, Manual of Terms, at p. 107. The terms "casinghead gas" and "residue gas" essentially "refer to the gas at a different stage of processing or treatment." *Read v. Britain,* 414 S.W.2d 483, 487–488 (Tex.Civ.App.1967).

regardless of whether the gas has had its liquid hydrocarbons or impurities removed by processing. We therefore conclude that the district court erred in ruling that Amerada's residue gas used as a lease fuel is not entitled to the exemption.

## III. ESTOPPEL

Amerada asserts that the district court erred in determining that the circumstances in this case are insufficient to estop the Commissioner from assessing additional gross production taxes, penalties, and interest. We agree with the district court that, as a matter of law, Amerada has failed to establish estoppel against the Commissioner.[10]

In *Blocker Drilling Canada, Ltd. v. Conrad,* 354 N.W.2d 912, 920 (N.D.1984), we held that "estoppel against the government is not absolutely barred as a matter of law, even in matters concerning taxation," but emphasized that "the doctrine is not one which should be applied freely against the government...." We added that the doctrine "must be applied on a case-by-case basis with a careful weighing of the inequities that would result if the doctrine is *not* applied versus the public interest at stake and the resulting harm to that interest if the doctrine *is* applied." *Blocker Drilling, supra* [emphasis in original]. *See also City of Minot v. Johnston,* 379 N.W.2d 275 (N.D.1985); *Abbey v. State,* 202 N.W.2d 844 (N.D.1972).

In support of its claim of estoppel, Amerada relies on three letters it received from tax department officials, the Commissioner's unquestioned acceptance of its tax returns for the period under audit, and the Commissioner's failure to act through duly promulgated rules and regulations.

In February 1981, Walter M. Stack, director of sales and special taxes, wrote a letter to an Amerada attorney in response to a question whether the gross production tax is levied upon the gross value inclusive of the taxes paid by the producer and reimbursed by the purchaser. Stack answered that "our gross production tax is levied at the value of the oil or gas at the wellhead. It is based on the price at that point and it is our opinion that the gross value upon which the tax is to be computed is exclusive of the reimbursed tax." The Commissioner's assessment in this case assesses additional tax on the tax reimbursements.

In September 1983, Tax Commissioner Kent Conrad wrote a letter to Amerada's vice-president for exploration outlining the procedure to use when reporting the value of natural and casinghead gas at the well for gross production tax purposes when a portion of the residue gas which is processed from the natural and casinghead gas is stored and not sold. Conrad advised that Amerada could use one of two methods: "The first method is to report the wellhead value as if all the processed residue gas had been sold at current prices. The second method is to report the value at nominal value and calculate the additional tax due at the time the gas is removed from storage or sold."

In September 1984, Leon West, oil and gas tax auditor, wrote to an Amerada official in response to a question about trucking charges and their status in arriving at the taxable value of oil. West's letter included the following statements: "[G]ross value at the well means fair market value and not sales price. However, the Tax Department generally accepts the sales price as representative of fair market value if the sales price is consistent with the prevailing price in the field and if circumstances surrounding the sale are arm's length and usual, i.e., a willing buyer and a willing seller."

---

**10.** Amerada vigorously asserts on appeal that, with respect to the estoppel issue, summary judgment was inappropriate because material factual issues remain unresolved. We note that this position is directly contrary to the argument Amerada made to the district court in response to the Commissioner's motion to dis-miss the declaratory judgment action. In any event, under the circumstances of this case, resolution of any factual issues that do exist with regard to the estoppel issue would not change the legal result. *See Lohse v. Atlantic Richfield Co.,* 389 N.W.2d 352 (N.D.1986).

Unlike the situation in *Blocker Drilling,* all three letters in this case merely contain general statements about the nature of the gross production tax law. In *Blocker Drilling* the correspondence discussed a specific tax liability for the taxpayer, determined the use tax due, and arranged for a payment schedule. The Conrad and West letters were written in response to specific questions having no relevance to substantive issues raised in this case.

■ With regard to the Stack letter, Amerada has not asserted that under our gross production tax law tax reimbursements cannot be included in determining the gross value of gas at the well. Rather, Amerada contends that Stack's advising it that tax reimbursements were to be excluded estops the Commissioner from making the additional assessment. Although we are sympathetic to Amerada's predicament, it is well settled that administrative officers of the state cannot estop the state through mistaken statements of the law. *See Austin v. Austin,* 350 So.2d 102, 105 (Fla.Dist.Ct.App.1977); *Denton Enterprises, Inc. v. Ill. State Toll Hwy. Auth.,* 77 Ill.App.3d 495, 32 Ill.Dec. 921, 396 N.E.2d 34, 40 (1979); *see also Brown v. Richardson,* 395 F.Supp. 185, 189 (W.D.Penn.1975).

■ We are also not persuaded by Amerada's argument that the Commissioner is estopped from making the assessment because he accepted Amerada's returns without objection during the period in question. The mere failure to collect a tax is not a misrepresentation which will estop a tax authority from subsequently demanding payment of the tax. *See Hutchison Bros. Excavating Co., Inc. v. District of Columbia,* 511 A.2d 3, 7 (D.C.App.1986); *Internorth, Inc. v. Iowa State Bd. of Tax Review,* 333 N.W.2d 471, 475 (Iowa 1983).

■ Amerada also asserts that the Commissioner is estopped because of his failure to duly promulgate any rules or regulations governing the valuation of gas for the time in question.

Under § 57–51–21, N.D.C.C., the Commissioner is "authorized and empowered to prescribe and promulgate all necessary rules and regulations for the purpose of making and filing of all reports required hereunder and otherwise necessary to the enforcement" of Chapter 57–51, N.D.C.C. However, every legislative delegation of power does not give rise to a mandatory duty to promulgate administrative standards in order for that power to be validly exercised. *See Patton v. City of Decatur,* 337 So.2d 321, 324 (Ala.1976). It is settled that, as a general rule, an administrative agency is not required to promulgate detailed rules interpreting every statutory provision that may be relevant to its actions, or covering every conceivable situation which might come before it. *See, e.g., Go Leasing, Inc. v. National Transportation Safety Bd.,* 800 F.2d 1514, 1523 (9th Cir.1986); *Pulido v. Heckler,* 758 F.2d 503, 506 (10th Cir.1985); *West v. Chafee,* 560 F.2d 942, 947 (8th Cir.1977). Rather, an administrative agency may announce new principles through adjudicative proceedings in addition to rule-making proceedings. *See Detroit Automobile Inter-Insurance v. Comm'r of Insurance,* 119 Mich.App. 113, 326 N.W.2d 444, 446 (1982). As the Supreme Court stated in *Securities and Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947):

"Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule. Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order. To insist upon one form of action to the exclusion of the other is to exalt form over necessity.

"In other words, problems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the prob-

lem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency....

"That such action might have a retroactive effect was not necessarily fatal to its validity. Every case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency. But such retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law...." [Citations omitted.]

■ In the case before us, we believe that the public importance in the Commissioner's correct determination of Amerada's tax liability for the years in question in accordance with the Legislature's mandate outweighs the fact that Amerada may have relied on prior tax department policy. A tax authority may modify past practices to the disadvantage of a taxpayer if it is determined that the former practice was incorrect, and such action may take place in the absence of an authoritative court decision and even though it may result in the subjection of identical transactions occurring at different times to different tax treatment. *See Laurel Hill Cemetery Ass'n v. United States*, 427 F.Supp. 679, 691 (E.D.Mo.), *aff'd*, 566 F.2d 630 (8th Cir. 1977), and cases cited therein. *See also National Rifle Ass'n v. Young*, 134 F.2d 524, 526 (D.C.Cir.1943) ["At any time within the statute of limitations the Commissioner of Internal Revenue may cancel, retroactively, an exemption or deduction which he has erroneously allowed."]

■ Relying upon *Jewel Tea Co. v. State Tax Commissioner*, 70 N.D. 229, 293 N.W. 386 (1940), Amerada asserts that the Commissioner, at the very least, should be estopped from assessing penalties and interest. In *Jewel Tea Co., supra*, 70 N.D. at 238, 293 N.W. at 392, this court held that the tax commissioner abused his discretion in assessing a penalty against a taxpayer who had erroneously, but in good faith, claimed an exemption and the tax commissioner had "passive[ly] acquiesce[d]" in the returns filed for a two and one-half year period by failing to object to the exemptions claimed. Although upholding the additional tax liability, the court stated with regard to the penalty imposed:

"If the claim for exemption is raised in good faith, and the failure to remit the tax at the time the report is filed is due to such claim, the Commissioner should not inflict a penalty when he makes no determination of liability. If the Commissioner is satisfied the claim of exemption is not valid, it is his duty to determine the issue. A continuous failure to disallow the claims for exemptions or to repudiate interpretations will justify a retailer in believing his claim was allowed, or his interpretation approved. The statute makes provision for exemptions, and implies that the duty of passing upon the claim of exemption rests with the Commissioner in the first instance...." *Jewel Tea Co., supra*, 70 N.D. at 237, 293 N.W. at 391.

Like the statute at issue in *Jewel Tea Co.*, § 57–51–10, N.D.C.C., provides that the Commissioner, "in his discretion for good cause shown, may waive the penalty or the interest provided by this section." However, we find the reasoning of the court in *Jewel Tea Co.* inapposite under the circumstances of this case. The record establishes that before 1980, the tax department received "virtually no funding" from the Legislature to staff oil and gas gross production tax field auditors and that one person performed "cross checks between producer and purchaser reports, and as-

sessments were limited to small companies and small properties." The Commissioner did not conduct any oil and gas gross production tax field audits on the books and records of any taxpayer, including Amerada, until 1981, after the Legislature began adding audit positions to the tax department's oil and gas division. We do not believe that the failure to previously question Amerada's tax returns amounts to "passive acquiescence" when that failure is due to an inability to properly and thoroughly check gross production tax returns. In view of the complexities involved in administering and gauging compliance with the gross production tax laws, the fact that the Commissioner did not previously question Amerada's returns is an irrelevant consideration. Amerada has failed to demonstrate at this stage of the proceedings that the Commissioner abused his discretion in assessing penalties and interest.

We conclude that, as a matter of law, the doctrine of estoppel is unavailable to Amerada.

## IV. STATUTE OF LIMITATIONS

 In his cross-appeal, the Commissioner asserts that the district court erred in ruling that the six-year statute of limitations in § 28–01–16(2), N.D.C.C., applies to the assessment in this case. We agree with the district court's resolution of this issue.

Section 28–01–16(2), N.D.C.C., provides:
> "*28–01–16. Actions having six-year limitations.* The following actions must be commenced within six years after the claim for relief has accrued:
>
> \*　\*　\*　\*　\*　\*
>
> "2. An action upon a liability created by statute, other than a penalty or forfeiture, when not otherwise expressly provided."

The Commissioner contends that a statute which prescribes the time within which he must issue an assessment is a restriction on his authority and not on his remedy. The argument continues that because a restriction on the time within which the Commissioner must issue an assessment is therefore not a true statute of limitations, the district court improperly imposed the general statute of limitations where the Legislature has not expressly limited the Commissioner's authority. The Commissioner contends that the time within which he must issue an assessment is entirely within his discretion and that he has not abused that discretion in this instance.

The Commissioner's argument is based primarily upon this court's decision in *Langer v. Gray*, 75 N.D. 1, 25 N.W.2d 89 (1946). In *Langer*, the court discussed the predecessor statute to § 57–38–38(1), N.D. C.C., which required the tax commissioner to audit and, if necessary, assess additional income taxes within three years after the due date of the return. The tax commissioner argued that fraud on the part of the taxpayer tolled the three-year limitation period. This court rejected the argument, concluding that the statute affected the tax commissioner's "right" rather than the "remedy," and followed the general rule that fraud does not toll such a statute. The court stated:

> "Where a statute prescribes the procedure for determining a liability such as the one involved in this case and fixes the time within which the powers conferred by the statute shall be exercised, the time so fixed is a condition attached to the exercise of the authority vested by the statute. It is limitation of authority and not of the remedy. It is not a statute of limitations." *Langer, supra*, 75 N.D. at 7, 25 N.W.2d at 91.

The *Langer* court merely recognized the difference between remedial and substantive statutes of limitation in order to resolve the fraud issue and concluded that the statute was substantive in nature. *See generally Fetch v. Buehner*, 200 N.W.2d 258, 260–262 (N.D.1972); 51 Am.Jur.2d *Limitation of Actions* §§ 15 and 21 (1970). The *Langer* court did not address the possible application of remedial statutes of limitations, such as § 28–01–16(2), N.D.C.C., to tax assessment cases. We find nothing in *Langer* that forbids application of § 28–01–16(2), N.D.C.C., in this case.

The Commissioner, relying on *Wells County v. McHenry*, 7 N.D. 246, 74 N.W. 241 (1898), also asserts that the gross production tax statutes create a "perpetual lien" and therefore no statute of limitations is applicable. In *Wells County*, the taxpayer argued that the county was barred by the six-year statute of limitations from recovering real estate taxes. The court reasoned, primarily, that because the statute specifically provided that "[t]axes upon real property are hereby made a perpetual paramount lien thereupon ..." [1897 N.D. Sess.Laws Ch. 126, § 72], the application of any statute of limitation would impermissibly conflict with this statutory mandate. The court concluded that:

> "[T]he lawmaking power clearly manifested a purpose that no lapse of time should destroy taxes, or the right to enforce the lien thereof against the real estate on which they were levied, when it declared that such lien should be perpetual." *Wells County, supra*, 7 N.D. at 265, 74 N.W. at 247.

The lien provision of the gross production tax law provides in pertinent part that "[t]he tax herein referred to shall, at all times, be and constitute a first and paramount lien against the purchaser's or producer's property as the case may be, both real and personal...." § 57–51–11, N.D.C.C. Statutory provisions which do not expressly exclude each other from application must be considered together and, if possible, apparently conflicting provisions should be made to harmonize. *Elliot v. Drayton Public School District No. 19*, 406 N.W.2d 655, 658 (N.D.1987). Contrary to the Commissioner's argument, we do not believe that the phrase, "at all times," contained in § 57–51–11, N.D.C.C., was intended to create a "perpetual lien" thereby barring application of any statute of limitations to a tax assessment. Rather, we believe that the phrase manifests a legislative intent to give the state's tax lien continuing priority over other possible lien holders. *See* Annot., 59 A.L.R.2d 1144, 1152–1153 (1958). The language used in § 57–51–11, N.D.C.C., falls short of evidencing a legislative intention that the Commissioner be allowed to reassess gross production taxes in perpetuity.

It is clear that the gross production tax constitutes a "liability created by statute." *See, e.g., City of Los Angeles v. Belridge Oil Co.*, 42 Cal.2d 823, 271 P.2d 5, 11–12, (1954), *appeal dismissed*, 348 U.S. 907, 75 S.Ct. 292, 99 L.Ed. 711 (1955). Furthermore, no limitation is otherwise expressly provided for in the gross production tax statutes.[11] The limitations prescribed in Chapter 28–01, N.D.C.C., "apply to actions brought in the name of the state, or for its benefit, in the same manner as to actions by private parties." Section 28–01–23, N.D.C.C. We therefore conclude that the general six-year statute of limitations in § 28–01–16(2), N.D.C.C., applies to the assessment in this case.

The Commissioner next asserts that if the six-year statute of limitation applies, the statute did not begin to run until he issued the assessment. We disagree. The case relied upon by the Com-

---

**11.** The Commissioner asserts that because no time limitation for assessing additional gross production taxes appears in Chapter 57–51, N.D.C.C., the Legislature did not intend to limit his authority in this area. The Commissioner relies upon *Maher v. Ramsey County*, 75 N.D. 760, 767, 32 N.W.2d 679, 682 (1948), in which this court ruled that the general six-year statute of limitations did not apply to an action for a refund of estate taxes because the statute providing for the refund contained "no time-limit requirement." The reasoning of the *Maher* court on this point is faulty because if carried to its logical extreme, it would effectively render the provisions of Chapter 28–01, N.D.C.C., a nullity.

It seems to us that the failure of the Legislature in this case to specifically provide a time limitation for assessments under the gross production tax laws, when it has so provided in other areas of taxation [*see* § 57–38–38, N.D.C.C.], is an indication that the Legislature intended the general statute of limitations to apply. *See State v. Dalton*, 353 Mo. 307, 182 S.W.2d 311, 312 (1944); *cf. Federal Land Bank of St. Paul v. Lillehaugen*, 404 N.W.2d 452, 458 n. 4 (N.D.1987) [failure of Legislature to expressly exempt federal land banks from confiscatory price defense statutes, while expressly exempting them in other enactments relating to mortgage foreclosures, clearly manifested intention that confiscatory price defense statutes apply to federal land banks]. To the extent that the *Maher* court's reasoning is inconsistent with our decision, it is disapproved.

missioner for this proposition, *Feldman v. Granger,* 255 Md. 288, 257 A.2d 421, 425 (1969), is not on point. We agree with the district court that in the present case the Commissioner's cause of action accrued when Amerada's taxes became due under § 57–51–05(1), N.D.C.C. *See Belridge Oil Co., supra; Kansas City v. Standard Home Improvement Co., Inc.,* 512 S.W.2d 915, 918 (Mo.Ct.App.1974); *State v. Robertson,* 417 S.W.2d 699 (Mo.Ct.App.1967); *Westinghouse Elec. Corp. v. King,* 678 S.W.2d 19, 27 (Tenn.1984), *appeal dismissed,* 470 U.S. 1075, 105 S.Ct. 1830, 85 L.Ed.2d 131 (1985); *State v. Chicago & N.W. Ry. Co.,* 132 Wis. 345, 112 N.W. 515, 521 (1907).

 Amerada asserts, however, that the district court erred in failing to apply the two-year statute of limitations under § 28–01–18(2), N.D.C.C., to that part of the assessment covering penalties and interest. That section provides:

"*28–01–18. Actions having two-year limitations.* The following actions must be commenced within two years after the claim for relief has accured:

\* \* \* \* \* \*

"2. An action upon a statute for forfeiture or penalty to the state."

We do not believe that the statutory penalty and interest assessed in this case falls within the purview of the two-year limitation statute. Section 57–51–10, N.D.C.C., provides that "[w]here the tax provided for in this chapter shall become delinquent, there is hereby imposed a penalty ... together with interest...." Section 57–51–12, N.D.C.C., further requires the Commissioner to seek "collection of said tax, interest, and penalty...." These statutes establish that the penalty and interest are not assessed by the Commissioner but automatically attach to the gross production tax when it becomes delinquent. While the Commissioner may waive the penalty or interest under § 57–51–10, N.D.C.C., it is the tax statute rather than the tax authority that imposes the penalty and interest. *See Morrison-Knudson Co., Inc. v. State Board of Equalization,* 58 Wyo. 500, 135 P.2d 927, 938 (1943).

Because a penalty which is created by statute for failure to pay a tax assessment becomes part of the tax itself, [*see Sonleitner v. Superior Court,* 158 Cal.App.2d 258, 322 P.2d 496, 499 (1958)], courts construing statutes of limitations similar to § 28–01–18(2), N.D.C.C., have concluded that the penalty arising upon the delinquency of a statutory liability to pay a tax does not constitute a penalty or forfeiture within the meaning of the statute of limitations. *See Los Angeles County v. Ballerino,* 99 Cal. 593, 32 P. 581, 582 (1893); *Pinnacle Gold Mining Co. v. People,* 58 Colo. 86, 143 P. 837, 840 (1914), and cases cited therein; *but see State v. American Can Company,* 362 P.2d 291 (Alaska 1961). We further agree that interest on unpaid taxes after their due date does not constitute a penalty or forfeiture within the meaning of the statute, but is "intended to compensate the Government for the delay in payment of the tax." *Owens v. Commissioner of Internal Revenue,* 125 F.2d 210, 213 (10th Cir.1942). We conclude that the district court did not err in ruling that § 28–01–18(2), N.D.C.C., is inapplicable to the penalty and interest portion of the assessment.

For the reasons stated in this opinion, that part of the judgment holding that Amerada's residue gas used as a lease fuel is ineligible for the exemption from the gross production tax is reversed. The judgment is in all other respects affirmed.

ERICKSTAD, C.J., MESCHKE, J., and PEDERSON, Surrogate Justice, concur.

PEDERSON, S.J., sitting in place of GIERKE, J., disqualified.

VANDE WALLE, Justice, concurring in part and dissenting in part.

I concur in Part II of the majority opinion; I dissent to Part I of the majority opinion and, as a result, I would not reach the issues discussed in Parts III and IV thereof. I dissent to Part I of the majority opinion for some of the same reasons set forth in my dissent in *Rocky Mountain Oil & Gas Ass'n v. Conrad,* 405 N.W.2d 279,

284 (N.D.1987) (Vande Walle, J., dissenting).

Although I would not reach the issue of estoppel, the lack of any rules or regulations governing the valuation of gas for the time in question does, I believe, have significance with regard to the issue of gross value at the well discussed in Part I. Had the interpretation by the Tax Commissioner been consistent, I might agree that the failure to adopt rules and regulations would be insignificant. However, what has happened reflects a total departure by the Tax Commissioner from some 25 years of opposite treatment of this matter by that office. Like *Rocky Mountain,* this developed as a declaratory-judgment action and, as I noted in my dissent in that case, information concerning the history of the construction and interpretation of the statutes by the Tax Commissioner during those years would be helpful in deciding the issue at hand for it would give us an understanding of the intent of the Legislature in enacting the applicable statutes. As I further noted in dissent:

> "Unless there is a reasonable explanation for an abrupt change in interpretation of applicable statutes, changes in taxation policies are more properly matters for legislative determination than for the philosophy of the Tax Commissioner." *Rocky Mountain, supra,* at 285 (Vande Walle, J., dissenting).

Furthermore, although I might agree as a general principle with the statement from *Securities and Exchange Com. v. Chenery Corp.,* 332 U.S. 202–203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995, 2002 (1947), relied upon by the majority opinion to excuse the failure of the Tax Commissioner to promulgate rules and regulations governing the valuation of gas for the time in question, the factual context of that statement was substantially different from the case be-

fore us. In *Chenery,* the issue before the United States Supreme Court involved an order of the Securities and Exchange Commission which refused to approve a proposed amendment to a plan for reorganization of a public-utility holding company which had permitted stock acquired by its officers and directors and controlling stockholders pending the reorganization for the purpose of retaining control of the utility. The reasons the United States Supreme Court enunciated for not requiring a rule or regulation in *Chenery* are set forth in the majority opinion. It is apparent they do not apply here. These are problems the Tax Commissioner could reasonably foresee, for the contracts had been in existence since 1961, the statute was enacted in 1953, and the gas has been processed at the plant since 1955. Surely there was enough experience with the problem to adopt a rule. As noted by the Court in *Chenery,* in the sentences immediately preceding those quoted in the majority opinion:

> "Since the Commission, unlike a court, does have the ability to make new law prospectively through the exercise of its rulemaking powers, it has less reason to rely upon ad hoc adjudication to formulate new standards of conduct ... The function of filling in the interstices ... should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future." [1]

Here, unlike *Chenery* wherein the Court noted that it would refuse to forbid the Securities and Exchange Commission from utilizing the Chenery Corporation action to announce and apply a new standard of conduct because the Commission "had not previously been confronted with the problem of management trading during reorganization," the matter of valuation of the gas

1. In a prior case the United States Supreme Court noted that rule-making, the quasi-legislative power, is intended to complete absent but necessary details in the statutes. See *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911). That function appears particularly applicable in this instance. Davis, in his *Administrative Law Treatise,* states that issues other than adjudicative are best developed through notice and comment procedure whether the proceeding is one of rule-making or one of adjudication. 3 K. Davis, *Administrative Law Treatise,* sec. 14.5 (1980). It appears to me such a procedure is far preferable to the one used here where after some 25 years of acceptance of returns the Tax Commissioner issued an assessment of additional oil and gas production taxes, penalties, and interest.

was a matter at issue since 1955 when Signal began processing the gas at the Tioga plant. Thus, if the Tax Commissioner was, without a corresponding change in the statute, to so dramatically alter a practice of some 25 years in determining the valuation of the gas for the purpose of the gross-production tax, it would have seemed a most opportune time to do so by exercising the rulemaking authority under Section 28–32–02, N.D.C.C. That section provides, in part:

"Prior to the adoption, amendment, or repeal of any rule, the agency shall adopt a procedure whereby all interested persons are afforded reasonable opportunity to submit data, views, or arguments, orally or in writing. *In case of substantive rules, opportunity for oral hearing must be granted if requested.*"[2] [Emphasis supplied.]

Following the statutory procedure may very well have provided us with a better basis for considering the issue than is provided by the declaratory-judgment procedure.

I also question what will happen if, at some time, the contract price for gas exceeds that achieved by using the "workback" method. Will the Tax Commissioner apply the lower price? It is apparent that the policies of the Tax Commissioner in this respect may very well affect the contract price of gas. Those contracts may be long-term contracts and it appears that the participants are entitled to knowledge before the fact of the policies of the Tax Department or entitled to a hearing pursuant to Section 28–32–02, N.D.C.C., if those policies are to be changed without a corresponding change in the applicable statutes.

Finally, the majority appears to excuse the inaction of the Tax Commissioner because prior to 1980 "the tax department received 'virtually no funding' from the Legislature to staff oil and gas gross production tax field auditors ..." Although I recognize the practicality of that statement insofar as the relationship between the branches of government is concerned, I am

dubious that such a situation somehow excuses that inaction with regard to a third party. It seems to me that for these purposes there can be no difference between the Legislative and Executive branches of government and that any failure to adequately fund the audit efforts of the Tax Department cannot be used against a third party.

On the basis of the record before us, I would reverse the declaratory judgment insofar as it appears to approve the Tax Commissioner's method of determining the fair market value of the gas for purposes of the gross-production tax.

---

2. The Tax Commissioner has adopted a procedure for public notice and hearing on proposed rules. See Section 81–01.1–03–01, North Dakota Administrative Code.